Daphne ENGLAND and Larry England  *v.*
Emil COSTA, M.D.

04-1192                                              216 S.W.3d 585

Supreme Court of Arkansas
Opinion delivered November 10, 2005

*William A. Newman* and *Lesher and Murray*, by: *Monty G. Murry*, for appellants.

*Atchley, Russell, Waldrip & Hlavinka, L.L.P.*, by: *Jeffrey C. Lewis*, for appellee.

Tom Glaze, Justice. In this medical-malpractice suit, our court is asked to determine when it is appropriate to give a modified form of AMI Civ. 4th 602, which deals with the right to assume others will use ordinary care and obey the law.

Appellant Daphne England became pregnant in 1997; her due date was December 24, 1997. That date came and went, and England had not gone into labor, so her obstetrician, appellee Dr. Emil Costa, asked her to come back to see him on December 31, 1997. England was still not showing signs of delivery by that date, so Dr. Costa scheduled a nonstress test[1] for January 2, 1998. However, England came to the hospital with contractions early in the morning on January 1, 1998, and she was hooked up to a fetal monitor for a number of hours. At 4:10 a.m., the monitor strip showed that the baby had a baseline heart rate of around 120, within normal ranges. At 4:16 a.m., however, the baby's heart rate dropped down, went back up, and then dropped back down again. This deceleration, or slowing of the heart rate, lasted about four minutes. The nurses attending England did not inform Dr. Costa of the deceleration.

Dr. Costa arrived at the hospital around 8:30 a.m. on January 1, 1998, at which time he reviewed the monitor tracing. His impression of the strip was that England was having mild irregular contractions. Despite the earlier deceleration, the activity reflected on the strip was reassuring and "within a normal range," and so Dr. Costa sent England home to wait one more day.

England returned to the hospital on January 2, 1998, at which time her cervix was only dilated to one centimeter. Dr. Costa performed another nonstress test, which showed lots of accelerations and good variability in the baby's heart rate. Because of this good result, Dr. Costa decided to wait another forty-eight hours to see if England would go into labor; if not, he would have her return to the hospital on January 4, 1998, to induce labor.

England returned to the hospital with irregular contractions around 10:30 a.m. on January 4. Her pregnancy was at forty-one weeks and four days, but she was still only dilated to one centime-

---

[1] According to the plaintiffs' expert, Dr. Bernard Weiss, a nonstress test involves applying sound waves to the uterus in order to stimulate accelerations in the baby's heart rate; the point is to test the baby's heart rate and make sure that the heart rate is normal.

ter. She was again hooked up to a fetal monitor, which showed a lot of accelerations, good variability, and no significant decelerations. Dr. Costa came to the hospital around 12:30 or 12:40 p.m. and reviewed the monitor strips; he then applied Cytotec, a drug intended to induce labor. Afterwards, he watched England for a period of time, then left the hospital. England experienced a deceleration around 1:30 p.m., but the nurse on duty failed to tell this to Dr. Costa. Dr. Costa again returned to the hospital about 6:00 p.m. and reviewed the most recent hour and a half of the monitor strip, which looked normal. He also asked the nurse, Missy Barham, if anything had happened after he last left; despite knowing about the earlier deceleration, Barham said, "no."

As of 6:00 p.m. on January 4, 1998, England had dilated to about one-to-two centimeters; the fetal heart rate was 110 to 120; there were no decelerations at that time; England was having contractions every two to three minutes; and there was no distress. Based on this information, Dr. Costa decided to let England's labor move forward, as opposed to performing a cesarian section. Dr. Costa went to bed around 9:30 or 10:00 p.m. that night. Before going to bed, he called the hospital and left orders that, if England did not go into labor by 3:00 or 3:30 a.m., he wanted to start her on Pitocin to induce labor.

At 2:21 a.m., England reported to the nurses that she felt the need to have a bowel movement. The nurse's notes from that time reflected that the fetal heart rate was 120, which indicated that the baby was still doing well. However, according to Dr. Costa's testimony, the urge England felt was more than likely the baby's head putting pressure on her pelvis. Dr. Costa averred that the nurses should have conducted a pelvic examination and called him to return to the hospital. No pelvic exam was performed until 2:40 a.m., at which time the nurses noticed that England's cervix had dilated to nine centimeters.

However, Dr. Costa did not hear from the hospital until 2:51 a.m., when Nurse Everett called to say the baby's heart rate was down and was not coming up. Dr. Costa immediately called for an emergency cesarian section and returned to the hospital, but when he arrived at the operating room, no surgical staff was present. Dr. Costa ended up performing an emergency cesarian section with only one nurse present to assist him. The baby,

Morgan England, was delivered at 3:24 a.m., January 5, 1998, with cerebral palsy, which, according to England's expert witness, was most likely caused by a "significant hypoxic insult in the time immediately prior to the emergency cesarean section."[2]

England and her husband, Larry England, sued Dr. Costa and the hospital. The Englands eventually settled with the hospital for $2.5 million, and the case proceeded to trial against Dr. Costa alone; the Englands informed the jury of the settlement and admitted that the negligence of the hospital and the nurses was a proximate cause of their damages. Just prior to submitting the case to the jury, the parties and the court struggled to agree on whether or not to give a modified form of AMI Civ. 4th 602 to the jury.

As written, AMI Civ. 602 provides that "[e]very person using ordinary care has a right to assume, until the contrary is or reasonably should be apparent, that every other person will [used ordinary care] [and] [obey the law]. To act on that assumption is not negligence."

The Englands argued that the instruction had only been applied in automobile-accident cases in which contributory negligence was an issue. The trial court ultimately rejected the Englands' argument and gave a modified version[3] of the instruction to the jury, as follows:

> Every *physician* using ordinary care has the right to assume, until the contrary is or reasonably should be apparent, that every other *medical care provider* will use ordinary care. To act on that assumption is not negligence. *As I have used the term ordinary care here, I mean that degree of care required of all physicians or medical care providers, as already explained in my definition of negligence.*

After deliberating, the jury returned a verdict in Dr. Costa's favor on February 26, 2004.

The Englands filed a motion for new trial on March 26, 2004, in which they alleged that the trial court improperly in

---

[2] According to one doctor's testimony, based on his reading of the medical records, Morgan "required major resuscitation" and did not breathe for approximately eleven minutes after she was delivered.

[3] The language altered and inserted by the trial court is italicized.

structed the jury. The effect of the erroneous instruction, they contended, was that the jury was urged toward the defense's theory of the case and rendered a verdict that was contrary to the preponderance of the evidence. After a hearing on April 13, 2004, the trial court denied the Englands' motion for new trial, noting that while the issue was one of first impression, and there were no reported Arkansas cases in which the instruction had been given in a medical-malpractice case, the court believed it was a proper instruction. The Englands filed a timely notice of appeal on April 14, 2004.

In their sole point on appeal, the Englands argue that, as a result of the erroneous charge to the jury, the verdict was contrary to the preponderance of the evidence. In their complaint, the Englands alleged that Dr. Costa was negligent in failing to properly evaluate the entirety of the fetal monitor strip on January 4, 1998 (as well as the days leading up to January 4), and in failing to respond to the abnormalities and decelerations on the strip by performing a cesarean section on January 4. The Englands further alleged that the nurses were negligent when they failed to properly evaluate the fetal monitor strip and failed to keep Dr. Costa informed of the information on the monitor strip. The effect of the modified AMI Civ. 602 instruction, the Englands contend, is that Dr. Costa was insulated from liability because the instruction informed the jurors that Dr. Costa could not be negligent for assuming that the nurses would not act negligently. By telling the jurors that Dr. Costa had a right to rely on the nurses to use ordinary care, the Englands assert, there was no way that Dr. Costa *could* have been found negligent.

The crux of the Englands' argument is that AMI 602 is only intended to be used in cases involving contributory negligence, and they assert that the cases addressing the instruction are all contributory negligence cases, usually involving automobile accidents. *See, e.g., Rexer v. Carter*, 208 Ark. 342, 186 S.W.2d 147 (1945); *Kirby v. Swift & Co.*, 199 Ark. 442, 134 S.W.2d 865 (1939); *Coca-Cola Bottling Co. v. Shipp*, 174 Ark. 130, 297 S.W. 856 (1927) (opinion on rehearing). As such, they contend, given the fact that there was no allegation that Daphne England was herself negligent in any way, the instruction should not have been used at all, let alone in the modified form in which it was given in the instant case. We agree.

*Rexer v. Carter, supra,* involved an automobile accident in which the defendant, Rexer, ran a stop sign and collided with Carter. Carter sued, and Rexer defended by saying that Carter should have known that he could not observe the traffic that was approaching the intersection. The trial court submitted to the jury the questions of negligence and contributory negligence, and the jury found in Carter's favor. This court affirmed the use of the instruction, noting that the jury could have found from the testimony that Carter was not bound to anticipate Rexer's recklessness in running a stop sign. In so affirming, this court noted that the driver of an automobile has the right to assume that the driver of another automobile will obey traffic laws, and he is not guilty of contributory negligence in acting upon such assumption. *Rexer*, 208 Ark. at 345.

Likewise, in *Kirby v. Swift, supra,* this court held that a plaintiff had the right to assume that no one would park a car on the road without lights; in such a situation, the issue of whether the plaintiff was exercising ordinary care was a question for the jury to examine in determining whether the plaintiff had been contributorily negligent. *Kirby*, 199 Ark. at 868.

Finally, in *Coca-Cola Bottling Co. v. Shipp, supra,* this court held, on rehearing the case, that the "better rule"was to let a jury decide whether a plaintiff had been contributorily negligent. Relying on *Murphy v. Hawthorne,* 117 Or. 319, 244 P. 29 (1926), the *Shipp* court wrote as follows:

> While some courts have announced a hard and fixed rule that it is negligent to drive an automobile at such rate of speed that it cannot be stopped within the range of the driver's vision, . . . we think it improper to do so. . . . After all, the test is, what would an ordinarily prudent person have done under the circumstances as they then appeared to exist? . . . *Plaintiff had a right to assume, in the absence of notice to the contrary, that defendant would not put this dusty gray colored truck on the highway after dark without displaying a red light on the rear thereof.* If the truck had been lighted, the jury might well have drawn the reasonable inference that plaintiff would have been able to avoid striking it. . . . While there is authority to the contrary, we believe the better reasoned cases support the holding that whether plaintiff failed to exercise due care to avoid the collision was a question of fact for the jury.

*Shipp*, 174 Ark. at 138 (emphasis added). Clearly, *Shipp*, *Kirby*, and *Rexer* all involved situations in which there was a question as to whether the plaintiff had been contributorily negligent.[4]

Further analysis of cases from other states with a similar jury instruction make it plain that the instruction should only be given when contributory negligence is an issue. Particularly instructive are cases from California involving that state's instruction, California Civil Jury Instruction (BAJI) 3.13, which is essentially similar to our AMI 602. The California instruction provides as follows:

> Every person who is exercising ordinary care, has a right to assume that every other person will perform [his] [her] duty [and obey the law]. In the absence of reasonable cause for thinking otherwise, it is not negligence for a person to fail to anticipate an accident which can occur only as a result of a violation of [law] [or] [duty] by another person.

California cases citing this instruction are unequivocal in holding that the instruction *should not be used when there is no evidence of violation of the law or a duty by the plaintiff. See Springer v. Reimers*, 4 Cal. App. 3d 325, 84 Cal. Rptr. 486 (1970) (instruction was not proper where the plaintiff was not contributorily negligent); *Eramdjian v. Interstate Bakery Corp.*, 153 Cal. App. 2d 590, 315 P.2d 19 (1957) (no error in refusing to give the instruction when there was no evidence that the plaintiff had violated the law or a duty; giving the instructions under these facts would only have confused the jury).[5]

---

[4] The comments to AMI 602 direct the reader to 65 C.J.S. *Negligence* § 281 *et seq.* (2000). That section of C.J.S., in turn, encompasses a discussion of the "last clear chance" doctrine, which provides generally that the plaintiff who negligently subjects himself or herself to a risk of harm may recover when the defendant discovers or could have discovered the plaintiff's peril had he or she exercised due diligence, and thereafter fails to exercise reasonable care to avoid injuring the plaintiff. 65 C.J.S. *Negligence* § 281 (2000). The last clear chance doctrine is applicable only to excuse the contributory negligence of the plaintiff. *Id.* at § 282. The doctrine requires, among other things, that there be negligence on the part of the plaintiff. *Id.* at § 285. Our court of appeals, however, has recently noted that neither the doctrine of last clear chance nor assumption of the risk is the law of Arkansas, and that both doctrines have been subsumed by the adoption of the comparative negligence statutes in 1955 and 1957. *See Miller v. Hometown Propane Gas, Inc.*, 86 Ark. App. 189, 110 S.W.3d 304 (2004).

[5] In his brief, Dr. Costa attempts to rely on a recent California case in which this instruction was given in a medical malpractice action. *See Estate of Harrar v. Teregis*, 2002 WL

Other jurisdictions have similarly only applied the rule in contributory negligence cases. *See Vaughn v. Porter*, 140 Idaho 470, 95 P.3d 88 (2004) (assumption that all other drivers on the road are exercising ordinary care does not apply when the driver/plaintiff herself is not exercising ordinary care); *Flowers v. South Carolina State Highway Dep't*, 206 S.C. 454, 34 S.E.2d 769 (1945) (a traveler on the highway, exercising due care himself, in the absence of any circumstances which reasonably should put him on notice to the contrary, is entitled to assume, and to act upon the assumption, that others using the highway in common with him will exercise reasonable care).

■ In sum, where there is no evidence of contributory negligence, AMI 602 should not be given. Generally speaking, when the instruction is utilized in a contributory negligence case, the phrase "every person" in the instruction is intended to refer to the plaintiff. Here, however, the jury was instructed that "every physician" is entitled to the assumption that other medical-care providers are not being negligent. In other words, the instruction informed the jury that a *defendant* is entitled to the presumption. This utilization of the instruction in this context was entirely improper, and is not to be countenanced. Obviously, there was neither evidence nor intimation that Daphne England was negligent in any manner. The trial court was clearly wrong in giving AMI 602 in any form.

This court has held that when a trial court gives an erroneous instruction involving the trial mechanism to be used in deciding either a civil or criminal case, we will not require the appellant to demonstrate prejudice. *See Skinner v. R.J. Griffin & Co.*, 313 Ark. 430 , 855 S.W.2d 913 (1993). Such a requirement is often an impossible burden, and the requirement of an impossible burden, in effect, renders the requirement of correct instructions on the law meaningless. *Id.*; *see also Long v. Lampton*, 324 Ark. 511, 922 S.W.2d 692 (1996). On the other hand, we have also held that the error may be rendered harmless by other factors in the case. *See Ouachita Wilderness Institute, Inc. v. Mergen*, 329 Ark. 405, 947 S.W.2d 780 (1997). This court noted in *Skinner, supra*, that examples of harmless error would be where the jury demonstrably

---

863171 (Cal. App. 2002). However, this is an unpublished opinion, and California's court rules prohibit the citation to or reliance on opinions that have not been certified for publication or ordered published. *See* Cal. Rules of Ct. 977(a).

was not misled because the jury rejected the theory of the erroneous instruction, or where the erroneous instruction was obviously cured by other correct instructions. *Skinner*, 313 Ark. at 435.

Thus, we must consider whether the giving of the improper instruction constituted harmless error. The Englands frame the issue before the jury as follows: Given that the hospital nurses did not timely contact Dr. Costa concerning the decelerations on the fetal monitoring strip, was Dr. Costa under an independent duty to discover those decelerations himself, and if so, was his failure to do so a proximate cause of Morgan England's brain damage? The crux of the Englands' argument is that the giving of AMI 602 answered the first of these two questions in the negative, by informing the jury that he had the right to assume that the nurses were not behaving negligently (even though they admittedly were negligent in failing to inform him of the decelerations on the monitor strip). And in giving the erroneous instruction, the trial court essentially prevented the jury from considering whether Dr. Costa's failure to read the strip, in and of itself, constituted a failure to meet the standard of care of "possess[ing] and apply[ing] with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing in the same or a similar locality."[6]

Dr. Costa, on the other hand, asserts simply that there was overwhelming evidence that his negligence had nothing to do with the baby's brain damage; he points out that experts on both sides testified that Morgan England was perfectly healthy and normal until approximately 2:10 a.m. on January 5, 1998. Accordingly, the doctor claims, his failure to notice the decelerations on the monitor strip earlier in the day on January 4, 1998, could not have been the proximate cause of Morgan's injuries.

Had the jury not been given the AMI 602 instruction, Dr. Costa might have had a valid argument. Without the giving of the erroneous instruction, it would have been clear that the jury determined that Dr. Costa "possessed and applied with reasonable care the degree of skill and learning ordinarily possessed and used by members of his profession in good standing, engaged in the same type of practice in the locality in which he practices, or in a

---

[6] *See also* Ark. Code Ann. § 16-114-106(a) (Supp. 2005).

similar locality," and that there was no negligence on his part that was the proximate cause of Morgan's injuries.

Here, however, the verdict form asked the jury to answer the question, "Do you find from a preponderance of the evidence that there was negligence on the part of Dr. Costa, which was a proximate cause of any damages?" The jury answered no. Given this general verdict, coupled with the jury having been given the erroneous instruction, it is impossible to determine whether the jury believed that Dr. Costa was not negligent because he comported himself in accordance with the standard of care required of all physicians, as described above, or whether the jury determined that he was not negligent because he was entitled to assume that the nurses were not negligent, which was an incorrect statement of the law.

As noted above, this court has held that, in cases involving a trial court's giving of an erroneous jury instruction, we will not require an appellant to demonstrate prejudice. *See Skinner, supra.* Further, we have held that when an erroneous instruction has been given and a jury has rendered a general verdict from which prejudice due to the error cannot be ascertained, we must reverse. *See Dillard Department Stores, Inc. v. Adams,* 315 Ark. 303, 867 S.W.2d 442 (1993). Accordingly, because it is impossible to determine the degree to which the improper instruction tainted the jury's consideration of Dr. Costa's negligence, we must reverse and remand this case.

GUNTER, J., not participating.

IMBER, J., concurs.

ANNABELLE CLINTON IMBER, Justice, concurring. AMI Civ. 4th 602 may properly be given when a plaintiff is attempting to show that the defendant in a case was negligent, *or* when the defendant is trying to show that the plaintiff was contributorily negligent. In this case, the instruction was given to allow the defendant, Dr. Costa, to "shift the blame" to another defendant party and not to the plaintiff. Thus, the circuit court erred in giving the instruction. AMI Civ. 4th 602 may only be used between parties who are aligned against each other as a plaintiff and a defendant. In other words, AMI Civ. 4th 602 should not be given in a case with a completely innocent plaintiff because there would be no blame for the defendant to "shift" to the innocent plaintiff. Consequently, the

circuit court here erred in giving the instruction in a case involving an allegedly negligent defendant, Dr. Costa, and free-from-negligence plaintiffs, the Englands.

Although I agree with the majority's conclusion that the instruction was improperly given, I must respectfully disagree with the majority's statement that the phrase "every person" as used in AMI Civ. 4th 602 is "intended to refer to the plaintiff." AMI Civ. 4th 602 states that "every person" has the right to assume "every other person" is exercising ordinary care. This instruction can be used for the benefit of either a plaintiff *or* a defendant in a lawsuit. The instruction is not limited to plaintiffs alleging negligence against defendants. *See St. Louis Southwestern Railway Co. v. Evans,* 254 Ark. 762, 497 S.W.2d 692 (1973) (defendant-railroad had the right to assume plaintiff-motorist would exercise ordinary care in approaching a railroad-crossing and defendant-railroad was entitled to the benefit of the AMI Civ. 602 instruction); *Haynes v. Bee-Line Trucking Co.,* 80 F.3d 1235 (8th Cir. 1995) ("[I]t is just as likely that the jury interpreted [AMI Civ. 4th 602's] reference to 'every person using ordinary care' to apply equally" to the plaintiff and the defendant).

AMI Civ. 4th 602's "every person" may refer to either a plaintiff or a defendant. The instruction is not intended to only be used for the benefit of the plaintiff. I understand that the majority was "generalizing" in their statement that AMI Civ. 4th 602 is "intended to refer to the plaintiff." However, it is important to note that the language of the instruction and our case law interpreting the instruction allows AMI Civ. 4th 602 to be used for the benefit of either the plaintiff or the defendant.

For the above-stated reasons, I concur.