# United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 08-2712

_____

Diane Cook; Michael Cook,    *
          *
    Appellants,     *
          *   Appeal from the United States
    v.        *   District Court for the Eastern
          *   District of Missouri.
City of Bella Villa; Chief of Police   *
Edward Locke, Jr., in his individual   *
capacity,         *
          *
    Appellees.     *

_____

Submitted: April 16, 2009
Filed: October 2, 2009

_____

Before RILEY, BENTON, and SHEPHERD, Circuit Judges.

_____

RILEY, Circuit Judge.

Diane Cook (Diane) and Michael Cook (Michael) (collectively, Cooks), filed suit against Chief of Police Edward Locke Jr. (Chief Locke) and the City of Bella Villa (City) (collectively, Appellees) for alleged federal civil rights violations. The Cooks included supplemental state law claims against Chief Locke for malicious prosecution and indecent assault and battery, and against the City on a theory of respondeat superior. The Cooks voluntarily dismissed their state law respondeat superior claims against the City. Appellees filed a motion for summary judgment on

the Cooks' remaining claims. The district court[1] granted summary judgment in part, leaving only three claims for the jury to consider. The Cooks did not pursue the one remaining state law claim, indecent assault and battery. During the jury trial, at the close of all the evidence, the district court granted judgment as a matter of law on the Cooks' municipal liability claim. The jury then found for Chief Locke on the remaining claim that Chief Locke, in violation of the Fourth Amendment, improperly touched Diane. The Cooks now assert seven errors. We affirm.

## I.    BACKGROUND

### A.    Factual Background

On August 26, 2005, Diane and her husband, Michael, joined two friends, Elizabeth Walkmaster (Walkmaster) and Brenda Markley (Markley), to celebrate Diane's birthday. Diane drove her mother's car; Diane and Michael picked up Walkmaster and Markley; and the four arrived at K.C.'s Bar and Grill (K.C.'s) at approximately 7:00 p.m.[2] Diane claims she had two beers while seated at the bar, and then she had a third beer with dinner. Michael drank only Pepsi that evening, but he did take prescription medications, including an inhaler, Vicodin, and Robaxin. Walkmaster consumed two white Russians, and Markley consumed four to six rum and Cokes and considered herself to be "drunk."

"[A] little before midnight," Diane, Michael, Walkmaster, and Markley decided to leave K.C.'s because Walkmaster, who had been diagnosed with a terminal brain tumor, was not feeling well. Upon leaving K.C.'s, Diane drove, Walkmaster was seated in the front passenger seat, Michael was seated in the rear passenger seat

---

[1]The Honorable Stephen N. Limbaugh, Sr., United States District Judge for the Eastern District of Missouri, now retired.

[2]Markley stated in her deposition that Markley's husband dropped Markley off at K.C.'s, where she waited about two hours for Diane, Michael, and Walkmaster to arrive.

behind Walkmaster, and Markley sat in the rear passenger seat behind Diane. After stopping for gas, followed by a trip home for money, and a purchase of cigarettes, Diane drove towards Walkmaster's home. Diane usually avoids driving in Bella Villa because the City has a "reputation" for being a "speed trap." On this occasion, Diane claims she was in a hurry to get Walkmaster home, so Diane decided to drive through Bella Villa.

Diane proceeded west on Bayless Avenue, stopped at a light near the entrance to Highway 55, and noticed a patrol car had pulled behind her. The officer was Chief Locke, whom neither Diane nor Michael had ever met. Chief Locke claims he was monitoring traffic at 3955 Bayless Avenue when he saw a vehicle, driving in the fast lane, cross over the double yellow street lines three times. Diane denies crossing over the street lines. Chief Locke activated his patrol car's lights and sirens, and pulled Diane over on Highway 55. Chief Locke parked behind the vehicle Diane was driving, approached the driver's side of the vehicle, and asked Diane for her driver's license and insurance card.

Diane produced her driver's license, but could not locate the insurance card in her mother's car. After Diane searched for a period of time, Chief Locke stated, "Don't worry about the [insurance] card." Chief Locke then asked Diane if she had been drinking. Diane "sarcastically" replied she was "working on 32 ounces of Diet Pepsi," although Diane understood Chief Locke was inquiring whether Diane had consumed alcohol. Chief Locke asserts Diane slurred her words and smelled of alcohol. Diane denies slurring her words and states she does not know if she smelled like alcohol.

Chief Locke asked Diane to exit her vehicle and Diane complied, following Chief Locke to the front of his patrol car. Chief Locke states Diane was swaying and almost lost her balance, but Diane states she was walking "very steadily." Chief Locke opened his patrol car's front passenger side door, reached in the vehicle, and

instructed Diane to get rid of the cigarette she was smoking. Chief Locke asserts he asked Diane to blow into a preliminary breath test device and to submit to three field sobriety tests, but Diane refused. At this point, Michael, who was straining to see out the back window of the vehicle, opened the rear passenger side door about ten inches so he could see out of the door.

Diane "asserts that when Chief Locke requested her to blow into a preliminary breath test device[,] he did so by holding his fist closed and demanding that she blow in it, all without explaining either that he had a[n] alcohol testing device in his hand or why he wanted her to blow into his hand." Diane maintains she asked Chief Locke, "Why," and Chief Locke responded, "Because I told you to. That's why." Diane replied, "Well, I don't understand," and Chief Locke answered, "You have failed to maintain a single lane for a full mile." Diane then argued,

> For starters, you haven't been behind me for a full mile, and for second, I don't know what you have in your hand, where it came from, what it's for. . . . You haven't even, you know, said anything that, you know, I'm stumbling, I'm stinking of alcohol, you know. Don't you do some kind of roadside test or sobriety test or—You haven't looked in my eyes or anything.

Diane claims Chief Locke responded, "I can do whatever I want and I can choose to give you whatever test I want, so either you blow in this or you're going to jail for DWI." Diane said "[f]ine," and Chief Locke instructed Diane to turn around and put her hands behind her back because she was under arrest for driving while intoxicated. Diane complied by putting her hands behind her back, and when Chief Locke handcuffed her, she exclaimed, "Fine. We'll see who's drunk." Diane contends Chief Locke then slammed her onto the hood of his patrol car. Diane responded sarcastically, stating, "Damn, Danno, take it easy."

-4-

Michael states, when he saw Chief Locke "slam[] [Diane] onto the hood of the car," he started to get out of the car, to which Markley responded, "Mike, don't do it." Michael decided to sit back down. At this point, Walkmaster had also opened her door and was crying and yelling, "She didn't do anything. She didn't do anything. What are you doing?"

Diane says after she made the "Danno remark," Chief Locke thrust his knee between her legs, and while Diane was still leaning on the hood of the patrol car, Chief Locke began to paw and stroke her, beginning at Diane's waist and moving down to her buttocks. Diane testified Chief Locke was "rubbing down [her] butt onto and around [her] inner/outer thighs, [and then] around the front." Diane could hear Michael and Walkmaster yelling, but she told them, "I'll take care of it. It will be okay." Diane claims Chief Locke then slid his hands under her sweater and began "working his hands up from [her] waist up to [her] sides towards [her] breasts." Michael stepped out of the car at that point and was yelling at Chief Locke. Diane claims less than a minute passed from the time Chief Locke began to touch her to the time Michael stepped out of the vehicle.

Michael testified that when he saw Chief Locke slide his hands down Diane's buttocks and in between her legs, Michael declared, "Oh, hell no!" and started to get out of the car again. Michael saw Chief Locke begin to slide his hands under Diane's jacket, so Michael stepped out of the vehicle and said, "Yo dude, what's the problem?" and, "You can't be touching her thataway." Michael described Chief Locke looked like "[a] deer in headlights." Walkmaster also exited the vehicle and was yelling and crying. Chief Locke ordered Walkmaster to get back into the vehicle, and Walkmaster complied. Michael did not get back in the vehicle because Chief Locke told him, "I'll talk to you in a minute." Diane reports Chief Locke marched her

-5-

towards Michael, and said, "Get back in the fucking car," and in the same motion, pulled out his taser and simultaneously tased Michael.[3]

Michael describes these events as follows:

> The next thing I know, [Chief Locke] started walking towards us, so I took one step back. I had a cigarette in my right hand. I looked down to flip the ashes and I heard him say something, but you know what, I couldn't tell you what because the next think I know, I'm laying on the ground doing a fish.

Michael maintains he only took one step toward Chief Locke and Chief Locke never told him to get back in the car.

Chief Locke denies slamming Diane onto the hood of his patrol car or conducting any kind of pat down or search of Diane's person. Instead, Chief Locke testified he did not have time to conduct a search of Diane because, as he started to place Diane's left hand into handcuffs, the rear passenger side door opened. Chief Locke did not know who was getting out of the car, and Chief Locke ordered the individual to stay in the car and close the door.

Chief Locke contends that as he attempted to place Diane under arrest, Michael exited the vehicle and began yelling at Chief Locke, "[Y]ou're not going to arrest my wife, you're not touching my wife, you're not arresting my wife." Chief Locke says he yelled at Michael to get back in the car so Chief Locke could continue handcuffing Diane. Chief Locke explains that as he finished handcuffing Diane, Michael ran

---

[3]This was not the first occasion when Michael was tased by a police officer. During his deposition, Michael testified that about four years before he was tased when he tripped and fell in his front yard, falling against a police officer. Another officer thought Michael was pushing the first officer. The second officer used the same type of prong taser as Chief Locke used on Michael.

toward Chief Locke and pushed Chief Locke's shoulder in an attempt to move Chief Locke away from Diane. Chief Locke continued to hold onto Diane with his left hand, pulled out the taser with his right hand, and darted Michael in the chest.

Chief Locke reports that after Michael fell to the ground, Chief Locke walked Diane to his patrol car and placed her in the front passenger seat. Chief Locke contends he tased Michael and attempted quickly to secure Diane because Michael's actions posed a big safety concern, as they were standing on the side of the highway, and Michael approached on Chief Locke's gun side before shoving Chief Locke on the shoulder. Diane claims that after Chief Locke tased Michael, Chief Locke slammed Diane on the trunk of her car, walked over to Michael, and then placed Diane in the patrol car.

While Chief Locke placed Diane in the patrol car, Michael removed the darts from his chest and threw them in a ditch. Chief Locke contends Michael stood up, immediately ran at him again, and made contact with Chief Locke's shoulder. Chief Locke states he was able to grab Michael and put him against the car, but Michael attempted to push back as Chief Locke began to handcuff Michael. Michael declares he was merely attempting to stand up when Chief Locke grabbed him and threw him against the side of Diane's mother's vehicle. Michael claims Chief Locke then handcuffed Michael and again pushed him against the side of the car, splitting Michael's right eye open.

Once Michael was handcuffed, Chief Locke took Michael to the back of the patrol car and told him to get in the car. Chief Locke relates Michael got in the car without any further incident. Michael contends he was not immediately able to get into the back of the patrol car because he has a back condition which makes it difficult for him to bend sideways. When another officer arrived at the scene, Michael charges Chief Locke put his hand on Michael's head and started pushing him into the car, which resulted in Chief Locke slamming Michael's head into the door and cutting the

left side of Michael's head. The second officer, a St. Louis County officer, arrived to assist Chief Locke, who had called for assistance after he tased Michael.

Chief Locke and the second officer looked for the taser darts in the ditch, and told Markley and Walkmaster that they would need to call someone to pick them up. Markley's husband picked them up. Chief Locke asked Diane if she would rather have the vehicle impounded or privately towed. After some discussion, Chief Locke decided the car would be impounded. Chief Locke exited the patrol car when the tow truck arrived, and Diane asserts that when Chief Locke got back into the patrol car, he reached his hand under her buttocks with his palm up and grinned at Diane and looked back and grinned at Michael.

Upon arrival at the police station, Chief Locke cited Diane for failing to maintain a single lane and for driving while intoxicated. Diane went to trial in state court, was found guilty on both offenses, and was sentenced to two years probation. Michael was cited for interfering with a police officer and resisting arrest. Michael's charges were dismissed because the conduct giving rise to the charges occurred outside Bella Villa's city limits.

### B. Procedural History

On October 17, 2006, the Cooks filed suit against Chief Locke and the City, asserting five separate claims: Count I alleged Chief Locke violated Diane's and Michael's rights under the Fourth and Fourteenth Amendments when Chief Locke subjected Diane to improper touching and used excessive force on Michael; Count II alleged the City was liable for Chief Locke's constitutional violations under theories of municipal liability; Count III alleged the City was liable for Chief Locke's conduct under a theory of respondeat superior; Count IV asserted state law claims of indecent assault and assault and battery against Chief Locke; and Count V asserted a state law malicious prosecution claim against Chief Locke for instituting charges against Michael. On August 9, 2007, the Cooks moved to dismiss the respondeat superior

state law claims alleged in Counts IV and V, and the district court granted the Cooks' motion on December 10, 2007.

Appellees filed a motion for summary judgment on November 6, 2007. The district court, on April 8, 2008, granted Appellees' motion in part, dismissing Michael's excessive force claim and Diane's substantive due process claim. The district court permitted Diane to proceed to trial on three claims: (1) Count I alleging Chief Locke improperly touched Diane in violation of the Fourth Amendment; (2) Count II alleging the City should be liable for Chief Locke's constitutional violations; and (3) Count IV alleging Diane's state law claim of indecent assault and battery. Diane did not pursue her remaining state law claim.

A jury trial began on April 28, 2008. At the close of all the evidence, Appellees moved for judgment as a matter of law, and the district court granted Appellees motion in part, dismissing the municipal liability claim against the City. The jury then considered Diane's constitutional claim of improper touching against Chief Locke, and returned a verdict for Chief Locke. Diane filed a motion for a new trial, which the district court denied.

The Cooks now appeal, claiming the district court: (1) erred in dismissing the Cooks' excessive force claims, (2) erred in granting Appellees' motion for judgment as a matter of law as to the City's municipal liability, (3) erred in its analysis of the Cooks' <u>Batson</u> challenge, (4) abused its discretion in denying the Cooks' motion for a new trial on the basis of a witness showing an inadmissible exhibit to the jury, (5) abused its discretion in refusing the Cooks' proposed jury instruction, (6) abused its discretion in denying the Cooks' counsel's request to make certain statements in closing argument, and (7) abused its discretion in denying the Cooks' motion for a new trial after Appellees' counsel made improper statements in closing argument.

-9-

## II. DISCUSSION

### A. Excessive Force Claims

The Cooks argue the district court mistakenly granted Appellees' motion for summary judgment on the Cooks' Fourth Amendment excessive force claims. "This court reviews a district court's grant of summary judgment de novo, viewing the evidence most favorably to the non-moving party." Davenport v. Univ. of Ark. Bd. of Trustees, 553 F.3d 1110, 1112-13 (8th Cir. 2009) (citation omitted). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." Id. at 1113 (citation omitted).

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted). "'The right to be free from excessive force is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures of the person.'" Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008) (quoting Guite v. Wright, 147 F.3d 747, 750 (8th Cir. 1998)). "A section 1983 action is supported when a police officer violates this constitutional right." Id. (citation omitted).

The force employed by an officer is not excessive, and thus not violative of the Fourth Amendment, if it was "objectively reasonable under the particular circumstances." Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir. 1994) (citation omitted). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the 'nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal marks omitted). This reasonableness analysis requires us to evaluate the totality of the

circumstances, including the severity of the crime, the danger the suspect poses to the officer or others, and whether the suspect is actively resisting arrest or attempting to flee. Id. (citation omitted). It is clear "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id. (citation omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal marks omitted).

### 1. Michael's Claims

Viewing the facts in the light most favorable to the Cooks, Michael stepped out of the vehicle to confront Chief Locke when Michael saw what he believed to be Chief Locke inappropriately touching Diane. Michael began yelling at Chief Locke and took one step forward. Chief Locke instructed Michael to get back into the car, and Chief Locke simultaneously tased Michael. After placing Diane in the front of the patrol car, Chief Locke picked Michael up off the ground and slammed Michael against Diane's mother's car. Chief Locke then instructed Michael to get in the patrol car, but when Michael had difficulty getting in the vehicle, Chief Locke pushed Michael into the car, hitting Michael's head on the door.[4]

In evaluating Appellees' motion for summary judgment, the district court concluded, "[Chief] Locke's conduct, in tasering and causing Michael's head to strike the subject vehicles, [was] objectively reasonable as a matter of law." The court continued, "In addition to being alone and outnumbered by presumably intoxicated suspects, Diane's sarcastic comments and noncompliance, coupled with Michael's wayward behavior in exiting the vehicle and opposing Locke's arrest and/or search

---

[4]The dissent criticizes this summary of the events. A non-summarized, detailed description of the events is contained on pages 2 through 8 of this opinion.

could lead a reasonable officer to respond in the manner described of [Chief] Locke." We agree.

During the course of the arrest, Michael claims Chief Locke pushed Michael against the side of Diane's mother's car, cutting Michael's eye. Michael also asserts he sustained a cut to the back of his head when Chief Locke forced Michael into the patrol car. The record before us contains pictures of these alleged injuries which reveal two puncture marks on Michael's chest where the taser darts entered, and, at most, a scrape to Michael's eyebrow. In its memorandum granting summary judgment on Michael's excessive force claim, the district court noted the lack of any significant injury sustained by Michael and no permanent physical injury.

"It remains an open question in this circuit whether an excessive force claim requires some minimum level of injury." Hunter v. Namanny, 219 F.3d 825, 831 (8th Cir. 2000) (citations omitted). However, the lack, or minor degree, of any injury sustained during an arrest is relevant in considering the reasonableness of the force used. See Greiner, 27 F.3d at 1355; see also Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) (concluding "relatively minor scrapes and bruises" combined with a "less-than-permanent aggravation of a prior shoulder condition were *de minimus* injuries" which did not support a finding of excessive force); Crumley v. City of St. Paul, 324 F.3d 1003, 1007 (8th Cir. 2003) (explaining "a de minimus use of force or injury is insufficient to support a finding of a constitutional violation"); Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990) (noting "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support [a] claim of excessive force"). Similarly, the injuries sustained by Michael are relevant in measuring the reasonableness of the force used by Chief Locke. During the course of his arrest, Michael sustained only minor scrapes and two taser puncture marks which did not require medical treatment.

-12-

The dissent, quoting Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993), asserts that the use of a taser "inflicts a painful and frightening blow," and when "inflicted without legitimate reason, supports the Eighth Amendment's objective component." The salient phrase from Hickey is "inflicted without legitimate reason." The circumstances presented to the jail officials in Hickey were vastly different than the circumstances presented to Chief Locke when he decided to use his taser. In Hickey, a jail official shot an inmate with a stun gun after the inmate refused to sweep his cell, and the inmate posed no threat to the jail officials. Id. at 758. In contrast, Chief Locke was not in a secure prison facility, but was alone, on a state highway, at midnight. While Chief Locke was arresting an uncooperative driver, Michael and Walkmaster were hysterically shouting at Chief Locke. Michael then stepped out of the vehicle, and took a step toward Chief Locke.

In Hickey, this court recognized that "summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy." Id. at 759 (collecting cases). The same is true for applications of force evaluated under the Fourth Amendment. See, e.g., Brown v. City of Golden Valley, 574 F.3d 491, 497 (8th Cir. 2009) (explaining, "[a] threat to an officer's safety can justify the use of force in cases involving relatively minor crimes and suspects who are not actively resisting arrest or attempting to flee," but holding insufficient safety concerns were present when a woman, who was frightened by police officers, called a 911 operator and was tased when she disobeyed the officer's demands to terminate her call); Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1105 (8th Cir. 2004) (finding no excessive force and the officer's action objectively reasonable when the officer deployed pepper spray inside a stopped vehicle after the officer reached his arm in the window to unlock the door and the driver began to roll up the window onto the officer's arm); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (finding no excessive force when an officer tased a stopped truck driver, and the driver, who had been instructed to step behind his vehicle, "was hostile, belligerent, and uncooperative," yelled at the officer,

and refused to comply with five commands to retrieve certain documents from his vehicle).  In Draper the Eleventh Circuit reasoned, "being struck by a taser gun is an unpleasant experience . . . [but] a single use of the taser gun causing a one-time shocking . . . did not inflict any serious injury."  Id.  And the court explained, "The single use of the taser gun may well have prevented a physical struggle and serious harm to either [the truck driver] or [the officer]."  Id.

Michael's complaint does not allege a permanent aggravation of his preexisting back condition, nor did the Cooks's Memorandum in Opposition to Defendants' Motion for Summary Judgment, or their appellate briefs before this court.  Michael testified in his deposition that he went to see a general practitioner three days after the incident.  Michael told his physician he experienced "stiffness and pain" in his shoulder, and his physician had Michael undergo x-rays and a CT scan.  When asked about the test results, Michael testified, "Everything came back looking good. . . . Well, there was some stuff in there, but it wasn't from [Chief Locke]."  Michael was asked, "Other than your pre-existing problems . . . was there anything new to your knowledge?"  Michael answered, "No."  Michael was also asked, "Are you making a claim for any neck or back . . . injuries as a result of Chief Locke's arrest?"  Michael responded, "No."  By his own admission, Michael denies claiming any permanent aggravation of a preexisting back condition or any other neck or back problem proximately caused by Chief Locke.

Chief Locke was responding to a rapidly escalating situation when he used force against Michael.  Around midnight, Chief Locke was outnumbered four to one and was experiencing yelling and non-compliance from three of four individuals when Michael exited the car and took a step toward Chief Locke.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396 (citation omitted).  We must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." Id. at 397. Under the circumstances, Chief Locke's use of force against Michael was objectively reasonable and does not amount to a violation of the Fourth Amendment. See Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007) ("If the allegations and undisputed facts do not amount to a constitutional violation, there is no necessity for further inquiries concerning qualified immunity." (citation omitted)); see also Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808 (2009).

### 2.    Diane's Claims

The Cooks also contend the district court erred in dismissing Diane's excessive force claims on summary judgment. The district court, in its memorandum granting partial summary judgment, never expressly addressed an excessive force claim asserted by Diane. This is likely because the Cooks' complaint failed directly to assert a claim for excessive force involving Diane. The complaint alleged Chief Locke inappropriately touched Diane in a sexual manner in violation of the Fourth Amendment, which the district court concluded was not necessarily objectively reasonable, permitting the issue to go to a jury.

The Cooks' complaint did allege Chief Locke "slammed" Diane's head onto a vehicle on two separate occasions. Appellees construed the Cooks' complaint as including a claim for excessive force against Diane and discussed this claim in their motion for summary judgment, stating, "Diane Cook also alleges in Count I that Chief Locke used excessive force in effectuating her arrest in violation of her Fourth Amendment rights when Chief Locke 'slammed' her head down onto the hood of his patrol car."

While the Cooks never moved to amend their complaint to include such a claim, the Cooks included Diane's excessive force claim in their memorandum in opposition to Appellees' motion for summary judgment, and drafted a parenthetical which argued, "Diane Cook's excessive force claim is not specifically pled in the 'Count I'

-15-

portion of the complaint, but the claim is supported by the factual allegations earlier in the complaint." Thereafter, both the Cooks and the Appellees addressed Diane's excessive force claim as if it had been properly pled in the complaint.

Federal Rule of Civil Procedure 15 describes the methods a party must use to amend a pleading. Fed. R. Civ. P. 15(a) explains that a pleading may be amended before trial, once as a matter of course before receipt of a responsive pleading, and "[i]n all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." The Cooks never moved to amend their complaint. However, Appellees' conduct—in drafting each of their subsequent motions as if the Cooks' complaint included a claim by Diane for excessive force —may constitute express written consent to litigate the claim.

Even if Appellees' conduct were insufficient to constitute written consent to amend the complaint, Rule 15(b) provides for amendment by implied consent. See Fed. R. Civ. P. 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). While Rule 15(b) provides parties with methods to amend a pleading any time during or after trial, and is therefore not directly applicable to this situation where the parties intended to amend the complaint before trial, the Federal Rules do recognize instances when a pleading may be amended by the implied consent of the parties. Under Fed. R. Civ. P. 15(b), "[a]mendments are allowed when the parties have had actual notice of an unpleaded issue and have been given an adequate opportunity to cure any surprise resulting from the change in the pleadings." Kim v. Nash Finch Co., 123 F.3d 1046, 1063 (8th Cir. 1997) (quoting Nielson v. Armstrong Rubber Co., 570 F.2d 272, 275 (8th Cir. 1978)).

In this case, Appellees had notice of Diane's additional excessive force claim, and Appellees responded to Diane's claim as if the claim had been expressly pled in the Cooks' complaint. Based upon the facts presented here, we assume the complaint

was amended, either expressly or impliedly, to include a claim by Diane charging excessive force. Although the district court failed to discuss this claim in its memorandum, the district court nevertheless dismissed Diane's excessive force claim on summary judgment in its order stating, "Defendants' motion . . . is. . . GRANTED *IN ALL OTHER RESPECTS*." We therefore consider this issue on appeal.

Construing the facts in the light most favorable to Diane, Chief Locke threw Diane against a vehicle on two separate occasions. The first occurrence took place after Chief Locke asked Diane to put her hands behind her back so Chief Locke could handcuff Diane. When Chief Locke handcuffed Diane, she exclaimed, "Fine. We'll see who's drunk." Chief Locke then slammed her head and chest on the hood of the patrol car. Diane asserts she responded sarcastically, stating, "Damn, Danno, take it easy." After a short time passed, Michael stepped out of the vehicle, and Chief Locke tased Michael. Diane claims after Chief Locke tased Michael, Chief Locke slammed Diane onto the trunk of her car, walked over to Michael, and soon thereafter placed Diane in the patrol car. Diane never alleged she sustained any injury as a result of being thrown against these vehicles, and she admits that she did not request any medical attention.

Chief Locke was alone and unassisted by other officers when he was confronted with a rapidly escalating confrontation involving four occupants of a vehicle. Diane was noncompliant and sarcastic, Michael and Walkmaster were yelling and shouting at Chief Locke, and Michael stepped out of the vehicle and took a step toward Chief Locke. Under these tense, evolving circumstances, a reasonable officer on the scene may have responded in the same manner as Chief Locke.

Diane did not sustain any injury from allegedly being thrown against the two vehicles. See, e.g., Greiner, 27 F.3d at 1355. Generally, allegations of an officer's use of a de minimus amount of force, without any resulting injury, are insufficient to support a finding of a constitutional violation. See Crumley, 324 F.3d at 1007; Foster,

914 F.2d at 1082.  We therefore conclude Chief Locke's use of force against Diane was objectively reasonable under the circumstances, and we decline to further conduct a qualified immunity analysis.  See Hayek, 488 F.3d at 1054.

## B.      Municipal Liability

After the district court partially granted Appellees' motion for summary judgment, only two issues remained for trial: (1) whether Chief Locke improperly touched Diane, violating her Fourth Amendment rights; and (2) whether the City was liable for Chief Locke's constitutional violations.  At the close of all the evidence, the district court granted Appellees' motion for judgment as a matter of law as to the issue of municipal liability.  The Cooks contend the district court erred.  We review the district court's decision to grant judgment as a matter of law de novo.  See Miller v. City of Springfield, 146 F.3d 612, 614 (8th Cir. 1998) (citation omitted).  "Judgment as a matter of law is proper when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  Id. (quoting Fed. R. Civ. P. 50(a)(1)).

Chief Locke was not found liable for any constitutional violation.  Absent a constitutional violation, there can be no municipal liability.  See Sanders v. City of Minneapolis, 474 F.3d 523, 527 (8th Cir. 2007) (citations omitted) ("Without a constitutional violation by the individual officers, there can be no [42 U.S.C.] § 1983 or Monell [v. Dept. of Soc. Serv., 436 U.S. 659 (1978)] failure to train municipal liability.").  Thus, we need not consider whether, at the close of all the evidence, there was a legally sufficient evidentiary basis for a reasonable jury to find the City liable.

## C.      Batson Challenge

During jury selection on Diane's Fourth Amendment improper touching claim, Appellees used one of their peremptory challenges to strike Juror 13.  Juror 13 was the last African-American on the jury panel, and Diane challenged the strike under Batson v. Kentucky, 476 U.S. 79 (1986), which forbids challenges against prospective jurors

based on race. On appeal, Diane claims the district court erred in failing to conduct a proper analysis to her <u>Batson</u> challenge.

"In order to succeed on a <u>Batson</u> challenge, a party must satisfy a three part-test." <u>Doss v. Frontenac</u>, 14 F.3d 1313, 1316 (8th Cir. 1994) (citing <u>Batson</u>, 476 U.S. at 96). First, an objecting party must make a prima facie showing that a peremptory challenge was made on the basis of race. <u>Snyder v. Louisiana</u>, __U.S.__, __, 128 S. Ct. 1203, 1207 (2008) (citations omitted). Second, if a prima facie showing has been made, the party striking the juror "must offer a race-neutral basis for striking the juror in question." <u>Id.</u> (quoting <u>Miller-El v. Dretke</u>, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)). Third, the trial court must determine whether the objecting party has proven the ultimate question of purposeful discrimination. <u>Id.</u> (citations omitted). "A district court's finding of purposeful discrimination in the jury selection process is a question of fact which we will reverse only if the findings were clearly erroneous." <u>Doss</u>, 14 F.3d at 1316 (citation omitted). "The trial judge's findings regarding purposeful discrimination largely turn on credibility determinations and are thus afforded great deference by this court on appeal." <u>Id.</u> at 1317 (citing <u>Batson</u>, 476 U.S. at 98 n.21).

Diane specifically argues the district court failed to make detailed credibility findings in the third step of the three-part <u>Batson</u> test, as required by <u>Snyder</u>, 128 S. Ct. at 1207. This court has consistently concluded no specific factual findings are necessary. In <u>U.S. Xpress Enters. v. J.B. Hunt Trans., Inc.</u>, 320 F.3d 809, 814 (8th Cir. 2003), this court held, "Under the circumstances of this case, the record adequately discloses a full <u>Batson</u> analysis, and we find that the failure of the trial judge to articulate his analysis of step three on the record did not constitute clear error." We did strongly urge district courts to "make on-the-record rulings articulating the reasoning underlying a determination on a <u>Batson</u> objection." <u>Id</u>. (citation omitted).

Similarly, in <u>Smulls v. Roper</u>, 535 F.3d 853, 860 (8th Cir. 2008) (en banc) (citations omitted), our court again explained, "federal law has never required explicit fact-findings following a <u>Batson</u> challenge, especially where a prima facie case is acknowledged and the prosecution presents specific nondiscriminatory reasons on the record. . . . A trial court's ruling on a <u>Batson</u> challenge is itself a factual determination, and we have repeatedly upheld rulings made without additional reasoning." We then concluded, "We do not read the Supreme Court's most recent case addressing <u>Batson</u> to hold otherwise." <u>Id.</u> (citing <u>Snyder</u>, 128 S. Ct. at 1203).

In the present case, the district court adequately completed each of the three prongs of the <u>Batson</u> test. The district court first gave Diane's counsel an opportunity to make a prima facie showing that the peremptory challenge was made on the basis of race. Diane's counsel claimed the strike was a violation of the holding in <u>Batson</u> because Appellees struck the last African-American from a jury panel and "the selected jurors would not adequately reflect the entire community." The district court, noting the plaintiff is a Caucasian female, explained, "I don't think you've made a prima facie case." We agree. However, the district court continued to the second prong stating, "In an abundance of caution, I will cause counsel to articulate non-discriminatory reasons in making the [strike.]" Once a race neutral explanation was provided, the district court gave Diane's counsel an opportunity to respond, which counsel declined. The district court then concluded, "I believe that the reasons articulated by counsel for the defendants were neutral and non-discriminatory, so I will overrule the <u>Batson</u> challenge to the jury." The district court conducted a sufficient analysis under <u>Batson</u>. <u>See Smulls</u>, 535 F.3d at 860.

## D.    Inadmissible Exhibit

The Cooks filed a motion for a new trial, alleging, among other charges, that during his trial testimony, Chief Locke improperly waived a preliminary breath test device (PBT) in front of the jury while the district court was in the process of holding the PBT inadmissible. The Cooks now claim the district court erred in failing to grant

a new trial under Fed. R. Civ. P. 60(b)(3), which permits such relief when an opposing party engages in misconduct.

In considering the Cooks' motion for a new trial, the district court explained the PBT was only excluded from evidence because Appellees failed to list the PBT as a trial exhibit and not because the PBT device was irrelevant. The court acknowledged the Cooks' concern "that the exhibit was flourished by [Chief Locke] in front of the jury in violation of the Court's ruling," but concluded, "Nonetheless, the error is harmless." The district court explained,

> Although during questioning, [Chief Locke] was not allowed to display the PBT, he was interrogated specifically about what a PBT looks like, how it is operated and the general implementation of the device. Had the jury not seen the PBT, there was ample legitimate description by the witness of its appearance and its use.

"We review a district court's denial of a motion for a new trial for abuse of discretion." Rottlund Co. v. Pinnacle Corp., 452 F.3d 726, 731 (8th Cir. 2006) (citation omitted). Under Rule 60(b)(3), "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . misconduct by an opposing party." "To prevail on a Rule 60(b)(3) motion, the moving party 'must establish that the adverse party engaged in fraud or other misconduct and that this conduct prevented the moving party from fully and fairly presenting its case.'" E.F. Hutton & Co. v. Berns, 757 F.2d 215, 216-17 (8th Cir. 1985) (quoting Stridiron v. Stridiron, 698 F.2d 204, 206-07 (3d Cir. 1983)). "The movant's burden of proof is one of 'clear and convincing evidence.'" Id. (quoting Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir. 1978)). "It is within the trial court's discretion to determine whether the Rule 60(b)(3) test has been met, and on review the only inquiry is whether there has been an abuse of discretion." Id. (citation omitted).

-21-

The district court did not err in denying the Cooks' motion for a new trial. It was within the district court's discretion to find Chief Locke's conduct, whether intentional or inadvertent, did not prevent the Cooks from fully and fairly presenting their case. Because Chief Locke was permitted to provide a detailed description of the PBT device, any improper showing of the device was merely duplicative of other evidence presented at trial.

### E. Jury Instruction

Diane also claims the district court abused its discretion when the court declined to use Diane's proposed jury instruction which quoted a portion of the Fourth Amendment. "We review the district court's jury instructions for abuse of discretion." Boesing v. Spiess, 540 F.3d 886, 890 (8th Cir. 2008) (citation omitted). "'[W]e afford the district court broad discretion in choosing the form and language of the instructions' and 'will reverse a jury verdict only if the erroneous instruction affected a party's substantial rights.'" Id. (quoting In re Prempro Prods. Liab. Litig., 514 F.3d 825, 829 (8th Cir. 2008)). "'[O]ur review is limited to whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues [in the case] to the jury.'" Id. at 890-91 (internal marks omitted) (quoting In re Prempro Prod. Liab. Litig., 514 F.3d at 829).

The district court considered Diane's proposed instruction and, after substantial deliberation, explained,

> I have searched the model forms recommended by the Eighth Circuit committee as to the giving of all of or portions of a provisions [sic] of the constitution as a part of the charge in any case and can find none and, accordingly, I'm going to determine that it is inappropriate to give that instruction and I will reject the request for it to be offered.

Instead, the district court instructed the jury,

Your verdict must be for plaintiff Diane Cook and against defendant Chief Edward Locke, Jr. on her federal civil rights claim for improper touching during her arrest if all the following elements have been proved by the greater weight of the evidence:

First, defendant Chief Edward Locke, Jr. stroked plaintiff Diane Cook's body over her clothes near the area of her crotch and on her legs, and stroked her skin under her shirt in the area of her torso; and thereafter, touched plaintiff's buttocks in the car.

Second, that conduct was unreasonable, and

Third, as a direct result, plaintiff Diane Cook was damaged.

If any of the above elements have not been proved by the greater weight of the evidence, then your verdict must be for the defendant.

Diane asserts the district court's refusal to give Diane's jury instruction violated her substantial rights "because without the instruction the jury did not have a clear understanding of the point of the case." We disagree. The Cooks have not provided any evidence or any reasonable inference to indicate the jurors did not have a clear understanding of the case. The instructions given by the district court fairly and accurately submitted to the jury the issue of improper touching in the context of an unreasonable Fourth Amendment seizure, and the district court did not abuse its discretion in disallowing Diane's proposed jury instruction.

### F.    Restricted Closing Argument

Immediately after the district court denied the Cooks' proposed jury instruction on the Fourth Amendment, the Cooks sought the court's permission to discuss the Fourth Amendment and the Bill of Rights in closing argument. The district court denied the Cooks' request. The Cooks now argue the district court abused its discretion. "Regulation of the parties' closing arguments rests within the discretion of the trial court and will not be disturbed unless a clear abuse of discretion is found." Williams v. Wal-Mart Stores, Inc., 922 F.2d 1357, 1364 (8th Cir. 1990) (citations omitted).

In the district court's order denying the Cooks' motion for a new trial, the district court explained,

> The jury is required to follow the instructions given by the Court to them, and the consideration of statutes or portions of the Constitution are not relevant for closing argument. In fact, arguing portions of the Constitution could quite easily confuse the jury when the jury is required only to follow the law given by the Court to them.

Discussing the Fourth Amendment and the Bill of Rights during closing argument in a Fourth Amendment violation case may be reasonable and permissible in certain situations. This discussion could be beneficial to the jury. Permitting that discussion or not is within the broad range of a district judge's discretion. That is the definition of judicial discretion: the realm of reasoned decisions within which a judge decides questions not expressly controlled by fixed rules of law.

We conclude the district court did not abuse its discretion when it refused to permit a party to argue law not discussed in the court's instructions to the jury. Cf. United States v. Mabry, 3 F.3d 244, 248-49 (8th Cir. 1993) abrogation on other grounds recognized in United States v. Sheppard, 219 F.3d 766, 767 (8th Cir. 2000) (finding a prosecutor's discussion of the law in closing argument was not error when the prosecutor's comments "were consistent with the court's instructions on the subject").

## G.     False Statements in Closing Argument

The Cooks argue the district court abused its discretion in denying the Cooks' motion for a new trial on the basis of Appellees' counsel's material misstatement of fact during closing argument. Appellees' counsel stated,

> There have been no other complaints involving [Chief Locke], involving his improperly patting down people or touching woman [sic] or doing something improper, there's been nothing. He has a perfectly clean and

unblemished record and now we have this accusation involving this man's reputation, this honorable person who is serving the community.

The Cooks did not object to this statement, nor did the Cooks discuss the statement in their rebuttal closing argument.

The statement made by Appellees' counsel in closing argument was a false statement. Multiple complaints had been filed against Chief Locke at the time of the Cooks' trial, several of which alleged misconduct similar to the Cooks' incident. See Cavataio v. City of Bella Villa, 510 F.3d 1015 (8th Cir. 2009); Schmidt v. City of Bella Villa, 557 F.3d 564 (8th Cir. 2009); Copeland v. Locke, No. 07-CV-2089 (E.D. Mo. 2009).

"This court examines the district court's ruling on closing arguments for an abuse of discretion because of its superior vantage in which to judge prejudice." Billingsley v. City of Omaha, 277 F.3d 990, 997 (8th Cir. 2002) (citations omitted). Generally, "[a] new trial should be granted where the improper conduct of counsel in closing argument [is] 'plainly unwarranted and clearly injurious.'" Id. (quoting Griffin v. Hilke, 804 F.2d 1052, 1057 (8th Cir. 1986)). However, "[a] failure to object to statements made during closing argument waives such an objection." Id. (citations omitted). "Only in extraordinary situations, in order to prevent a 'plain miscarriage of justice,' will a reviewing court reverse a judgment based upon errors not objected to at trial." Lange v. Schultz, 627 F.2d 122, 127 (8th Cir. 1980) (quoting Wichmann v. United Disposal, Inc., 553 F.2d 1104, 1106 (8th Cir. 1977)).

Because the Cooks failed to object to the statements made during Appellees' closing argument, and the Cooks do not assert any extraordinary circumstances which would support a reversal, we affirm the district court's denial of a new trial.

III.    CONCLUSION

We affirm the judgment of the district court.

SHEPHERD, Circuit Judge, concurring in part and dissenting in part.

Although I concur in the balance of the majority's opinion, I disagree with the majority's determination that, when the facts and all reasonable inferences are considered in the light most favorable to Michael–as required on review of a district court's grant of summary judgment–Chief Locke's use of force against Michael was objectively reasonable and did not amount to a Fourth Amendment violation. Therefore, I respectfully dissent from Part II.A.1 of the majority's opinion, affirming the dismissal of Michael's excessive force claim on that ground.

As the majority acknowledges, "[w]e review de novo the district court's grant of summary judgment, viewing all facts and reasonable inferences in the light most favorable to [Michael] [as] the nonmoving party." Merriam v. Nat'l Union Fire Ins. Co. of Pittsburgh, 572 F.3d 579, 583 (8th Cir. 2009). In my view, the majority's statement of the facts underlying Michael's excessive force claim is incomplete in light of the standard of review and neglects to "view[] all facts and reasonable inferences in the light most favorable to" Michael, as we must. See id.

Based on the facts as alleged by Michael, Michael witnessed Chief Locke touching Diane in a way that Michael believed to be inappropriate. When Chief Locke began moving his hands underneath Diane's shirt toward her breast area, Michael exited the vehicle. Michael stated, "Yo, dude, what's the problem? You can't be touching her thataway." When Michael made those comments, he was standing beside the car. Chief Locke told Michael that Chief Locke would talk to Michael in a minute. Michael remained where he was, smoking a cigarette. Chief Locke then walked Diane to where Michael was standing. Michael took one step toward Chief Locke. Chief Locke told Michael to "[g]et back in the fucking car" and, at the same time, Chief Locke tasered Michael. Michael never saw the taser. The taser darts hit Michael in the chest and shoulder. Michael fell to the ground. At that point, Diane

informed Chief Locke that Michael had medical problems, including a history of heart attack, a severely injured back, and two neck surgeries.

After handcuffing Diane, Chief Locke returned to Michael, who remained on the ground. Chief Locke pulled Michael up off the ground (Michael weighed 112 pounds at the time) and slammed his body into the side of the car. Chief Locke then handcuffed Michael. While holding both of Michael's hands, Chief Locke took Michael by the neck and pushed him against the side of the car, splitting open the skin above his right eye. Chief Locke then walked Michael back to the patrol car. Chief Locke told Michael to get into the patrol car and began forcing him into the car. Diane told Chief Locke that Michael had neck and back injuries. Michael asked Chief Locke to give him a minute to get into the vehicle because it was difficult for Michael to bend sideways to get into the car. Instead, Chief Locke took Michael by the back of his head and pushed his head into the vehicle, causing it to strike the side of the door frame. This resulted in a cut on the back of Michael's head. Chief Locke then pushed Michael into the back seat, and Michael fell into the seat. In assessing the reasonableness of Chief Locke's conduct, we "focus[] on factors such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Ngo v. Storlie, 495 F.3d 597, 602 (8th Cir. 2007) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)).

As to the seriousness of the offense, Chief Locke arrested Michael for resisting arrest and interfering with an officer. Although the offense of resisting arrest could certainly pose a risk to an arresting officer, here the facts, viewed in favor of Michael, indicate that he was not meaningfully engaged in this offense. The only instance of resistance by Michael, other than Michael yelling at Chief Locke to stop touching Michael's wife in a way that Michael believed to be inappropriate, is Michael's failure to comply with Chief Locke's command that Michael get back in the car. However, given the simultaneous nature of the issuance of that command and the application of

the taser, Michael's failure to comply cannot be deemed resistance. With regard to Michael's yelling at Chief Locke, "a reasonable officer would not discharge his Taser simply because of insolence." Parker v. Gerrish, 547 F.3d 1, 10 (1st Cir. 2008). The facts, viewed in the light most favorable to Michael, support the conclusion that Michael's resistance, if any, was de minimis such that he was not engaging in a serious offense which itself would justify the use of force.

With regard to the second factor, the facts, construed in favor of Michael, do not suggest that Michael posed an immediate threat to Chief Locke's safety. After Michael exited the car and yelled at Chief Locke, Chief Locke told Michael that Chief Locke would talk to Michael in a minute. According to Michael, he complied with the command and stood there waiting. Chief Locke came toward him, and Michael took a step in Chief Locke's direction. There is no indication that Michael was engaging in a "'dramatic' threatening move." See id. at 9. Thus, the facts do not indicate that Michael posed an immediate threat to Chief Locke's safety. The fact that Michael had been insolent or frustrated does not change this conclusion.

Finally, as to the third factor, nothing in the record demonstrates that Michael was actively resisting arrest or attempting to flee. Rather, Michael was generally compliant.

In addition, as the majority observes, "the injuries sustained by Michael are relevant in measuring the reasonableness of the force used by Chief Locke." Ante at 12. However, as the majority points out, "[i]t remains an open question in this circuit whether an excessive force claim requires some minimum level of injury." Id. (quoting Hunter v. Namanny, 219 F.3d 825, 831 (8th Cir. 2000) (citations omitted)). In analyzing an Eighth Amendment excessive force claim,[5] this court stated that a

_____

[5]"The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that 'arise[ ] in the context of an arrest or investigatory stop of a free citizen,' while the Eighth Amendment's ban on cruel and

taser "inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless." Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir. 1993). Indeed, Michael was knocked to the ground by the taser (which left puncture marks) where he remained until Chief Locke pulled Michael to his feet. The Hickey Court described the pain of being tasered as "exactly the sort of torment without marks . . . which, if inflicted without legitimate reason, supports the Eighth Amendment's objective component." Id.; accord Orem v. Rephann, 523 F.3d 442, 448 (4th Cir. 2008). Therefore, assuming that Michael must make a showing of some minimum level of injury in order to make out a claim for excessive force, the pain and puncture marks inflicted by the taser are sufficient to do so.

In sum, the facts construed in the light most favorable to Michael show that the degree of force used against him was not objectively reasonable, and, in turn, constituted a violation of his Fourth Amendment right to be free from excessive force. In his motion for summary judgment and before this court, Chief Locke asserted that, even if Michael demonstrated a constitutional violation, Chief Locke was entitled to qualified immunity because his alleged conduct did not violate clearly established law.[6] In light of its determination that Michael did not make out a constitutional

_____

unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000) (citation omitted) (quoting Graham v. Connor, 490 U.S. 386, 394 (1989)). While we analyze a Fourth Amendment excessive force claim under a solely objective standard, Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007), Eighth Amendment excessive force claims involve both an objective and subjective component, Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008). "In [Eighth Amendment] excessive force claims, the subjective inquiry is whether the force was used in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Id. (quotation omitted).

[6]"Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's

-29-

violation, the district court did not address whether Chief Locke's use of force violated a clearly established constitutional right. Accordingly, I would reverse the district court's grant of Chief Locke's motion for summary judgment as to Michael's excessive force claim and remand the matter for a determination of whether, in the specific context of this case, it would have been clear to a reasonable officer that the conduct at issue violated a clearly established constitutional right. Because the majority concludes otherwise, I respectfully dissent from Part II.A.1 of the majority's opinion.

———————————————

alleged misconduct." Brown v. City of Golden Valley, 574 F.3d 491, 496, (8th Cir. 2009). The Supreme Court has held that courts may exercise their discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first. Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).