FILED IN
COURT OF CRIMINAL APPEALS

February 17, 2015

ABEL ACOSTA, CLERK

PD-1615-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 2/17/2015 3:22:34 PM
Accepted 2/17/2015 3:26:13 PM
ABEL ACOSTA
CLERK

**No. PD-1615-14**

IN THE
TEXAS COURT OF CRIMINAL APPEALS

**THE STATE OF TEXAS,
PETITIONER,**

**v.**

**WILLIAM SMITH,
RESPONDENT.**

ON PDR FROM THE THIRTEENTH
COURT OF APPEALS

**PETITIONER'S BRIEF**

Douglas K. Norman
State Bar No. 15078900
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206
Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)
douglas.norman@co.nueces.tx.us

Attorney for Petitioner

# IDENTITY OF PARTIES AND COUNSEL

State's Trial Attorney:
 Mr. William Patrick Delgado
 State Bar No. 24064540
 Assistant District Attorney
 901 Leopard, Room 206
 Corpus Christi, Texas 78401

State's Appellate Attorney:
 Mr. Douglas K. Norman
 State Bar No. 15078900
 Assistant District Attorney
 901 Leopard, Room 206
 Corpus Christi, Texas 78401
 (361) 888-0410
 douglas.norman@co.nueces.tx.us

Appellant:
 William Smith
 1203 El Cibolo Rd.
 Edinburg, Texas 78542

Appellant's Trial Attorney:
 Mr. Mark DiCarlo
 State Bar No. 05812510
 722 Elizabeth Street
 Corpus Christi, Texas 78404

Appellant's Appellate Attorney:
 Mr. Donald B. Edwards
 State Bar No. 06469050
 P.O. Box 3302
 Corpus Christi, Texas 78463
 (361) 887-7007
 mxlplk@swbell.net

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL .................................................... i

INDEX OF AUTHORITIES................................................................iv

STATEMENT OF THE CASE................................................................ 1

ISSUES PRESENTED................................................................2

STATEMENT OF FACTS ................................................................ 2

SUMMARY OF THE ARGUMENT ............................................................3

ARGUMENT ................................................................ 4

I. Whether the implied consent and mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement. .................................................. 4

    I. THE IMPLIED CONSENT/MANDATORY DRAW STATUTE. ........................................................... 4

    II. THE *McNEELY* CASE.................................................................... 5

    III. RECOGNIZED EXCEPTIONS TO THE WARRANT REQUIREMENT................................................................ 9
        A. The Automobile Exception. ................................................. 9
        B. The Special Needs Exception and Warrantless Inspections of Closely Regulated Activities. ........................ 11
        C. Consent and Waiver.......................................................... 14
        D. Search Incident to Arrest.................................................... 18

    IV. OTHER SIGNIFICANT FACTORS. ..................................... 20
        A. Legitimate Governmental Interest. ............................... 20
        B. Gravity of the Offense......................................................... 21
        C. Bright-Line Rule................................................................. 21
        D. Presumption of Validity and Constitutionality. ............. 21
        E. The Underlying Expectation of Privacy.......................... 22

**F. Habitual Offenders Have a Diminished Expectation of Privacy.**................................................................23

**G. The Specific Context of a Post-Arrest Mandatory Draw.**..................................................................24

**H. Statutory Protections Concerning the Manner of Drawing Blood.** .......................................................25

**I. Mistake of Law.**...............................................................27

**V. THE UNIQUE NATURE OF THE INTRUSION – SEARCH OR SEIZURE?** ..........................................................28

**VI. CONCLUSION.** .............................................................30

**II. Whether the defendant preserves his Fourth Amendment objection to blood evidence when he fails to object to testimony concerning the results of testing done on that blood and only later objects to admission of the blood sample itself.** ............................................................31

PRAYER ...............................................................................34

RULE 9.4 (i) CERTIFICATION .............................................35

CERTIFICATE OF SERVICE ...............................................35

# INDEX OF AUTHORITIES

## Cases

*Arizona v. Gant*, 556 U.S. 332, 338 (2009). ................................................ 19

*Ex parte Arnold,* 916 S.W.2d 640, 642 (Tex. App.—Austin 1996, pet. ref'd) ..................................................................................... 15, 16

*Atwater v. City of Lago Vista*, 532 U.S. 318, 340-41, 121 S.Ct. 1536 (2001). ........................................................................................ 28

*United States v. Biswell*, 406 U.S. 311, 316-17, 92 S.Ct. 1593 (1972). . 12, 15

*Breithaupt v. Abram*, 352 U.S. 432, 436 (1957) .......................................... 24

*Brinegar* v. *United States*, 338 U. S. 160, 176 (1949) ................................. 27

*California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066 (1985). ................... 9, 10

*Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012). ........................ 30

*Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280 (1925). .................. 9, 10

*City of Ontario v. Quon*, 130 S.Ct. 2619, 2629-30 (2010). ................... 22, 23

*Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970). ..... 12

*Cook v. City of Bella Villa*, 582 F.3d 840, 849-50 (8th Cir. 2009) ............... 30

*Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 2000 (1973). ................. 19, 29

*Donovan v. Dewey*, 452 U.S. 594, 602 (1981). .......................................... 12

*Dunaway v. New York*, 442 U.S. 200, 213–14 (1979) .................................. 21

*United States v. Edwards*, 415 U.S. 800, 803 n.9 (1973). ........................... 19

*Ford v. State*, 919 S.W.2d 107, 117 (Tex. Crim. App. 1996). ...................... 33

*Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987). ............................................ 24

*Heien v. North Carolina*, --- U.S. ---, No. 13-604 (December 15, 2014)......... 27

*Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301 (1990). ............... 28

*Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946 (2001)............................. 9

*United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652 (1984). ........ 28

*Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009)................. 22

*United States v. Knights*, 534 U.S. 112, 120, 122 S.Ct. 587 (2001)........ 14, 23

*Leday v. State,* 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)...................... 33

*Life & Casualty Ins. Co. v. McCray*, 291 U.S. 566, 572, 54 S.Ct. 482 (1934). ........................................................................................................ 22

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323–25 (1978).......................... 12

*Maryland v. King*, 133 S.Ct. 1958, 1970 (2013). ............................. 20, 27, 29

*Meekins v. State*, 340 S.W.3d 454 (Tex. Crim. App. 2011). ........................ 14

*Missouri v. McNeely*, 133 S.Ct. 1552, 1556 (2013). ............................. passim

*New York v. Burger*, 482 U.S. 691, 702–03, 708 (1987)............................. 11

*Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012)......................................... 30

*Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 365 (1998). ....................................................................................................... 24

*State v. Powell*, 306 S.W.3d 761, 769 n.14 (Tex. Crim. App. 2010). .......... 28

*Powell v. State,* 898 S.W.2d 821, 829 (Tex. Crim. App. 1994). .................. 34

*Samson v. California*, 547 U.S. 843, 852, 126 S.Ct. 2193 (2006).... 14, 23, 24

*Schmerber v. California*, 384 U.S. 757, 769-70, 86 S.Ct. 1826 (1966). .............................................................................. 19, 25, 26, 29

*Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041 (1973). ....... 14

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989). .... 11

*South Dakota v. Neville*, 459 U.S. 553, 563 (1983)..................................... 24

*Texas Dept. of Public Safety v. Richardson*, 384 S.W.2d 128, 132 (Tex. 1964). ...................................................................................... 13, 16

*Texas Dept. of Public Safety v. Schaejbe*, 687 S.W.2d 727, 728 (Tex. 1984)..................................................................................... 15

*Tharp v. State*, 935 S.W.2d 157, 159 (Tex. Crim. App. 1996)......... 13, 15, 16

*State v. Villarreal*, PD-0306-14 (Tex. Crim. App, November 26, 2014). ....... 4

*Weems v. State*, No. 04-13-00366-CR, (Tex. App.—San Antonio, May 14, 2014). ........................................................................................ 7

*Welsh v. Wisconsin*, 466 U.S. 740, 751-52 (1984). ..................................... 21

*Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297 (1999).............. 20

*Zap v. United States,* 328 U.S. 624, 627-28, 66 S.Ct. 1277 (1946)........ 14, 15

**Statutes, Rules & Other Authorities**

Tex. Penal Code § 49.01. ............................................................................ 12

Tex. Transp. Code § 524.012....................................................................... 12

Tex. Transp. Code § 524.022....................................................................... 13

Tex. Transp. Code § 724.011........................................................................ 5

Tex. Transp. Code § 724.012...................................................................... 5, 8

Tex. Transp. Code § 724.013................................................................ 5, 8

Tex. Transp. Code § 724.016.................................................................. 5

Tex. Transp. Code § 724.017.............................................................. 5, 26

Tex. R. App. P. 33.1........................................................................... 33

*Texas Driver's Handbook* (rev. July 2012). ...................................... 16

Mo. Ann. Stat. § 577.020.1................................................................... 6

Mo. Ann. Stat. § 577.041...................................................................... 6

National Highway Traffic Safety Administration [NHTSA], Alcohol and Highway Safety: A Review of the State of Knowledge 167 (No. 811374, Mar. 2011) [NHTSA Review]). .................................................... 6

THE STATE OF TEXAS,        §        IN THE
          Petitioner,        §
                             §
V.        §        COURT OF CRIMINAL APPEALS
                             §
WILLIAM SMITH,        §
          Respondent.        §        OF TEXAS

## PETITIONER'S BRIEF

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through the District Attorney for the 105th Judicial District of Texas, and respectfully urges this Court to reverse the judgment of the Thirteenth Court of Appeals in the above named cause for the reasons that follow:

## STATEMENT OF THE CASE

William Smith was indicted for felony driving while intoxicated based on two prior DWIs, further enhanced to a habitual felony offender by two prior felonies. The trial court found Smith guilty and assessed punishment at 25 years in prison. Smith filed a timely notice of appeal.

A panel of the Thirteenth Court of Appeals reversed Smith's conviction based on the supposedly improper admission of blood evidence

1

that had been obtained pursuant to the implied consent and mandatory draw provisions of the Texas Transportation Code.

## ISSUES PRESENTED

**I. Whether the implied consent and mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement.**

**II. Whether the defendant preserves his Fourth Amendment objection to blood evidence when he fails to object to testimony concerning the results of testing done on that blood and only later objects to admission of the blood sample itself.**

## STATEMENT OF FACTS

State trooper David Anguiano stopped Smith for driving without wearing a seat belt. (RR vol. 1, p. 22) Upon approaching Smith's car, Anguiano smelled the strong odor of some sort of alcoholic beverage coming from him and saw numerous open alcoholic beverages spread throughout the vehicle. Anguiano observed that Smith's movements were slow and that he had glassy, blood-shot eyes. After further investigation, including administering the standardized field sobriety tests, Anguiano arrested Smith for driving while intoxicated. (RR vol. 1, pp. 23-32)

Anguiano testified that Smith made "a statement to the fact that it was a felony D.W.I. for him." (RR vol. 1, p. 43) After Anguiano confirmed Smith's criminal history, a different officer transported him to the hospital while Anguiano followed. (RR vol. 1, p. 43) At the hospital, Anguiano

2

tried to obtain Smith's consent to take a blood specimen, but when he refused consent, Anguiano informed Smith that the blood draw was mandatory. (RR vol. 1, pp. 44-45) Approximately one hour after the initial traffic stop, a certified medical technologist took a sample of Smith's blood. (RR vol. 1, p. 49)

## SUMMARY OF THE ARGUMENT

*Issue No. 1* – The implied consent / mandatory draw provisions of the Texas Transportation Code are a constitutionally valid alterative to the warrant requirement based on several related justifications, most of which balance the need to rid public roads of drunk drivers against the lessened expectation of privacy that impaired drivers have concerning the drawing of a sample of their blood, and on the driver's implied consent/waiver of the warrant requirement under narrowly specified circumstances.

*Issue No. 2* – Smith waived error on his constitutional challenge to the blood evidence in question by failing to object timely on Fourth Amendment grounds when the state offered the critical testimony of the forensic scientist concerning the incriminating results of the blood test.

## ARGUMENT

**I. Whether the implied consent and mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement.**

Although this issue has recently been decided against the State in *State v. Villarreal*, PD-0306-14 (Tex. Crim. App, November 26, 2014), that decision has not yet become final, and the State respectfully requests that the Court reconsider *Villarreal*, and hold as well in the present case that the implied consent and mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement, and that the decision of the Thirteenth Court of Appeals to the contrary should be reversed, for the following reasons.

## I. THE IMPLIED CONSENT/MANDATORY DRAW STATUTE.

Driving on a roadway is a privilege, not a right; by doing so, a defendant impliedly consents to providing a breath or blood sample when suspected of intoxication-related crimes. The Transportation Code provides as follows:

> If a person is arrested for an offense arising out of acts alleged to have been committed while the person was operating a motor vehicle in a public place, or a watercraft, while intoxicated, or an offense under Section 106.041, Alcoholic Beverage Code, ***the person is deemed to have consented***, subject to this chapter, to submit to the taking of one or more specimens of the person's breath or blood for analysis to determine the alcohol

4

concentration or the presence in the person's body of a controlled substance, drug, dangerous drug, or other substance.

Tex. Transp. Code § 724.011 (emphasis added). A person retains the right under most routine circumstances, subject to an automatic license suspension, to refuse to provide a specimen. Tex. Transp. Code § 724.013. However, the Legislature extinguished a defendant's right to refuse in cases where an officer possesses probable cause to believe that certain enumerated, egregious circumstances existed. *Id.* at § 724.012(b). In those narrow instances, the Transportation Code requires the arresting officer to "require the taking of a specimen of the person's breath or blood." *See* Tex. Transp. Code § 724.012(b). The Transportation Code then provides for the breath or blood specimen to be taken "at the request or order of" the officer in question. *See* Tex. Transp. Code § 724.016 (a) & § 724.017 (a).

## II. THE *McNEELY* CASE.

The Supreme Court's *McNeely* decision focused on the narrow question of "whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving questions." *Missouri v. McNeely*, 133 S.Ct. 1552, 1556 (2013). The five-vote majority reversed the warrantless seizure in *McNeely*,

5

holding that the State may not rely on a *per se* exigency premised solely on the natural dissipation of alcohol from the bloodstream. *Id.* at 1568.[1]

*McNeely's* disposition resulted in four separate opinions, including the 5-4 majority by Justice Sotomayor. However, only part of her decision garnered a majority; Justice Kennedy did not join in the last part of Section II, nor did he join Section III. Justice Kennedy's separate concurrence signaled – in express language – that the majority only decided the *per se* exigency issue on which *certiorari* had been granted, and nothing more. *McNeely*, 133 S.Ct. at 1569 (J. Kennedy, concurring in part). Justice Kennedy did not agree with Justice Sotomayor's Section III discussion discounting law enforcement's concerns regarding the need for a bright-line rule, nor did he join in the remaining plurality's minimization of the government's interest in preventing and prosecuting drunk-driving offenses. *Id.* at 1564-67 (Part III). While five justices voted against a *per se* application of exigency, all of the justices recognized some blood draws will be compelled, and there appears to be a differently-constituted-five-vote

---

[1] Missouri has an implied-consent statute, as do all fifty states. *See, e.g.,* Mo. Ann. Stat. §§ 577.020.1, 577.041; *see also McNeely*, 133 S.Ct. at 1566 (*citing* National Highway Traffic Safety Administration [NHTSA], Alcohol and Highway Safety: A Review of the State of Knowledge 167 (No. 811374, Mar. 2011) [NHTSA Review]). Yet, the Missouri prosecutors did not rely on their State's implied-consent statute or, for that matter, any other exception to the Fourth Amendment's warrant preference.

block that remains open to a modified rule departing from the warrant requirement in circumstances other than a *per se* blood-alcohol exigency. *See id*. at 1568-77 (J. Kennedy, concurring; Chief Justice Roberts, concurring and dissenting, joined by Justices Breyer and Alito; and Justice Thomas, dissenting). It should also be noted that the *McNeely* majority did not reject all "per se" or "categorical" exceptions to the warrant requirement, but rather only "per se" or "categorical" determinations of the exigent circumstances exception under consideration in that case. *Id.* at 1556-60; *but see Weems v. State*, No. 04-13-00366-CR, slip op. at 14 (Tex. App.— San Antonio, May 14, 2014) (misinterpreting *McNeely* in this manner).

Moreover, the *McNeely* opinions contain positive references to the implied-consent provisions enacted across this country. Part III of Justice Sotomayor's opinion, for instance, stated:

> States have a broad range of legal tools to enforce their drunk-driving laws and to secure BAC evidence without undertaking warrantless nonconsensual blood draws. ***For example, all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense***. See NHTSA Review 173; supra, at 1556 (describing Missouri's implied consent law).

*McNeely*, 133 S.Ct. at 1566 (emphasis added). The opinion continues by recognizing the "significant restrictions" States have placed on when an

officer may obtain a compelled sample. *See McNeely*, 133 S.Ct. at 1566 n.9 (listing mandatory-draw provisions countrywide as an example of how states have placed "significant restrictions" on when officers may obtain compelled samples). The Court even cites Texas' mandatory blood-draw statute. *Id. at* n.9 *citing* Tex. Transp. Code §§ 724.012(b), 724.013. Moreover, Justice Kennedy, who provided the crucial fifth vote in *McNeely*, states in his concurrence that States "can adopt rules, procedures, and protocols that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials." *Id.* at 1569. These opinions in no way disapproved of the States' carefully tailored implied consent schemes where only specified and limited situations authorized compelled blood draws after refusal. *See id.* at 1566 & n.9.

In addition, the language in each of the *McNeely* opinions, including the majority, assumes the gravity of the dangers faced by the traveling public due to intoxicated drivers. For example, the majority asserts as follows:

> ***"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."*** *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). Certainly we do not. While some progress has been made, drunk driving continues to exact a terrible toll on our society. *See* NHTSA, Traffic Safety Facts, 2011 Data 1 (No. 811700, Dec. 2012) (reporting that 9,878 people were killed in alcohol-impaired driving crashes in 2011, an average of one fatality every 53 minutes).

8

*McNeely,* 133 S.Ct. at 1565 (emphasis added). Nothing in any of the various *McNeely* opinions signals that any member of the Supreme Court would look unfavorably on implied consent provisions.

### III. RECOGNIZED EXCEPTIONS TO THE WARRANT REQUIREMENT.

Aside from exigent circumstances, the Supreme Court recognizes that there are exceptions to the warrant requirement, such that "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Illinois v. McArthur*, 531 U.S. 326, 121 S.Ct. 946 (2001).

### A. The Automobile Exception.

The automobile exception to the warrant requirement, first set out in *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280 (1925) and later repeated in numerous cases including *California v. Carney*, 471 U.S. 386, 105 S.Ct. 2066 (1985), recognized that, although the privacy interests in an automobile are constitutionally protected, its ready mobility and capacity to be "quickly moved" justifies a lesser degree of protection, noting also that there had been a long-recognized distinction between stationary structures and vehicles. *Carney*, 471 U.S. at 390. The Court in *Carney* recognized that the reduced expectations of privacy that justify the automobile exception

9

also derive from "the pervasive regulation of vehicles capable of traveling on the public highways." 471 U.S. at 392.

When the automobile exception had originally been recognized in *Carroll*, the Supreme Court looked to statutes contemporary with the adoption of the Fourth Amendment which allowed law enforcement officials, without a warrant, "to stop, search, and examine any vehicle, beast, *or person* on which or whom they should suspect [of a violation]." 267 U.S. 151 (quoting Act of March 3, 1815, 3 Stat. 231, 232) (emphasis added).

Arguably, the driver of an automobile in transit is just as mobile as his vehicle, just as subject to pervasive licensure and regulation, and, historically, was subject to search without warrant under the same terms as a vehicle or vessel. Accordingly, the Courts should recognize a driver exception to the warrant requirement coextensive with the vehicle exception.

However, even short of a full-fledged and free-standing exception of this nature, the Courts should allow the States to craft such an exception based both on these considerations, on the substantial public interest in ridding the road of drunk drivers, and on implied consent statutes like the Texas version, which condition the privilege of driving on the acceptance of a warrantless search under very limited circumstances.

As in *Carney*, the driving public is on notice of the lessened degree of privacy protection in matters that concern the safety of the roads on which they drive. They know that their cars can be stopped and searched on probable cause alone; likewise, under common mandatory blood draw statutes, they should know that their blood can be drawn without a warrant, on probable cause of DWI alone, under specified conditions. In both situations, the normal expectation of a warrant yields to common concerns inherent in a highly regulated activity in which the driver freely chooses to engage.

## B. The Special Needs Exception and Warrantless Inspections of Closely Regulated Activities.

In *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989), the Supreme Court articulated a "special needs" exception to the warrant preference. In *Skinner*, the Court found certain "well-defined circumstances" authorized warrantless, suspicionless blood draws to test railroad employees for drugs and alcohol; the protocol relied upon in *Skinner* arose out of a concern about serious public-transportation-safety issues involving railways. In other contexts as well, the Supreme Court has found that warrantless and suspicionless searches of closely regulated activities are reasonable when there is a substantial governmental interest and a regulatory scheme that forwards that interest. *New York v. Burger*, 482

U.S. 691, 702–03, 708 (1987) (warrantless entry and inspection of junk yards is reasonable); *Donovan v. Dewey*, 452 U.S. 594, 602 (1981) (same with mining sites); *United States v. Biswell*, 406 U.S. 311, 316–17 (1972) (same with federally licensed gun dealers).  The Supreme Court has only found such regulatory searches unreasonable when the regulation does not sufficiently limit the discretion of the government agent, *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323–25 (1978), or when agents completely disregard the parameters of the regulation or statute.  *See Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970) (concluding that the liquor industry is subject to regulation, suggesting that Congress could allow for warrantless inspection, but concluding that federal agents breaking into a liquor distributor's premises at night violated the Fourth Amendment absent special authorization under the regulation).

Under the mandatory draw provisions of the Texas Transportation Code, in addition to providing evidence for a criminal prosecution, the results of the blood draw may be used in the administrative removal of drunken drivers from the public roadways.  The Department of Public Safety must suspend the person's license if analysis of the blood reveals an alcohol concentration of 0.08 or greater.  TEX. TRANSP. CODE § 524.012(b)(1); TEX. PENAL CODE § 49.01(2)(B). The suspension is for a

period of 90 days or one year, depending on whether the person has had any prior DWI arrests in the ten years preceding the current date of arrest. TEX. TRANSP. CODE § 524.022(a).

This Court has noted that the "primary purpose of the administrative license suspension statute is not to deter the licensee or to seek retribution, but is to protect the public from the carnage on the public roads of Texas caused by drunk drivers." *Ex parte Tharpe*, 935 S.W.2d 157, 159 (Tex. Crim. App. 1996); *see also Tex. Dept. Pub. Safety v. Richardson*, 384 S.W.2d 128, 132 (1964) ("But, it should be made abundantly clear that in this case [of driver's license revocation] we are not concerned with criminal penalties but rather with an administrative and regulative power vested in the Texas Department of Public Safety which power has for its purpose the protection of the lives and property of those using the highways.").

Accordingly, the mandatory draw statute may be justified under the special needs exception, as applied to the closely regulated activity of driving on public roads, and as a tool not only of criminal enforcement but also for administrative measures designed to protect the public from drunk drivers by removing their driving privileges.

## C. Consent and Waiver.

Another recognized exception to the warrant requirement is a search conducted with the person's voluntary consent, which may be communicated to law enforcement in a variety of ways, including by words, action, or circumstantial evidence showing implied consent. *Meekins v. State*, 340 S.W.3d 454 (Tex. Crim. App. 2011) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041 (1973)) Such consent must ordinarily be carefully scrutinized for its knowing, intelligent and voluntary character. *See Id.*

However, the Supreme Court has long recognized a parallel exception in the form of a prior waiver of the Fourth Amendment rights to probable cause and a warrant, as a condition for some benefit extended to the suspect from the State. *Zap v. United States,* 328 U.S. 624, 627-28, 66 S.Ct. 1277 (1946), *vacated on other grounds,* 330 U.S. 800, 67 S.Ct. 857 (1947) (the benefit of doing business as a Navy contractor).[2] The waiver applies,

---

[2] Governmental and quasi-governmental bodies often condition the granting of a privilege upon the waiver of certain constitutional rights. The decision to participate in an activity is a prime example of this same give-and-take privilege. *See Board of Education v. Earls*, 536 U.S. at 828 (no Fourth Amendment violation where school board policy conditioned participation in extracurricular activities on random drug testing). Even in the criminal context, suspicion searches promoting a legitimate government interest pass Fourth Amendment muster based upon an offender's parolee status which invokes statutorily-required conditions agreeing to such searches. *Samson v.*

moreover, in spite of the suspect's protest at the time of the search in question. *See Id.* In the same way, acceptance of a license to engage in a pervasively regulated activity may carry with it an obligation to allow statutorily authorized inspections of that activity that would otherwise require a warrant. *See United States v. Biswell*, 406 U.S. 311, 316-17, 92 S.Ct. 1593 (1972) (gun dealer who chose to engage in this pervasively regulated business and to accept a federal license was subject to warrantless inspection of his business records and firearms).

A long line of Texas cases hold that "a driver's license is not a right, but a privilege." *Tharp v. State*, 935 S.W.2d 157, 159 (Tex. Crim. App. 1996) (quoting *Ex parte Arnold,* 916 S.W.2d 640, 642 (Tex. App.—Austin 1996, pet. ref'd)); *Texas Dept. of Public Safety v. Schaejbe*, 687 S.W.2d 727, 728 (Tex. 1984) (license suspension proceeding). Elaborating on this principle, this Court has quoted with approval statements made by that Austin Court of Appeals that "[a] license to drive an automobile on the

---

*California*, 547 U.S. 843 (2006); *see also United States v. Knights*, 534 U.S. 112 (2001) (upholding warrantless search of probationer's apartment where authorized by probation condition). In this context, the Supreme Court has suggested its approval of a bargained-for waiver in holding that "acceptance of a clear and unambiguous search condition 'significantly diminished [the suspect's] reasonable expectation of privacy,' … [such] that petitioner did not have an expectation of privacy that society would recognize as legitimate." *Samson v. California*, 547 U.S. 843, 852, 126 S.Ct. 2193 (2006) (quoting *United States v. Knights*, 534 U.S. 112, 120, 122 S.Ct. 587 (2001)).

streets is ... a privilege subject to reasonable regulations formulated under the police power in the interest of the welfare and safety of the general public." *Tharp*, 935 S.W.2d at 159 (quoting *Arnold,* 916 S.W.2d at 642). The Texas Supreme Court has likewise acknowledged that "one making use of the highways of the state is exercising a privilege which is subject to regulation." *Texas Dept. of Public Safety v. Richardson*, 384 S.W.2d 128, 132 (Tex. 1964).

With regard to public knowledge of the implied consent / mandatory draw provisions, the State would point to the *Texas Driver's Handbook* (rev. July 2012),[3] which is published by the Texas Department of Public Safety and asserts as its primary purpose "1) to help you qualify for a Texas driver license, and 2) to help you become a safer driver." (Handbook Introduction Page) In *Chapter Ten: How Alcohol and Drugs Affect the Ability to Drive*, the Handbook includes the following paragraph:

> **The Alcohol Test**
> If you are arrested for an offense arising from acts allegedly committed while operating a motor vehicle in a public place, a watercraft while intoxicated, or another alcohol-related offense, you are deemed to have consent to taking one or more specimens of breath or blood for analysis to determine the alcohol concentration or the presence in your body of a controlled substance, drug, or other substance.

---

[3] Available at http://www.txdps.state.tx.us/DriverLicense/documents/DL-7.pdf).

(Handbook p. 60) Though perhaps not written as clearly as it could have been, this paragraph clearly puts prospective drivers on notice of the implied consent law.

In addition, there is no indication that the Navy contractor in *Zap* actually read, much less consciously understood or knowingly agreed to, the waiver in question. However, unlike the consent exception recognized in *Schneckloth*, which on the one hand is unbargained-for and gratuitous on the part of the waiving party, and on the other is subject to strict scrutiny concerning its knowing and voluntary character, a bargained-for waiver, like any other contractual provision, binds a party even though he neglected to read the clause in question. In other words, unlike bare consent, a waiver acts more like a bargained-for contract that binds a party even though he neglected to read it, and it cannot later be withdrawn. In the case of a mandatory draw statute, which the law presumes the driving public to have read, the driver impliedly agrees ahead of time that, in exchange for the privilege of driving on our roads, he is willing to waive the right to a warrant in these limited circumstances. The deal is sealed when he gets behind the wheel, and it can't later be revoked when he gets caught driving in an impaired condition.

Moreover, implied consent statutes like the one in Texas do not apply to all motorists, but only to objectively impaired ones. Accordingly, there are two components over which the driver has control: (1) the choice to drive a vehicle on Texas roads; (2) in an objectively impaired condition that would create probable cause to believe he is intoxicated. A driver who wishes to avoid the inconvenience of a warrantless search of his or her blood may effectively do so simply by avoiding any alcohol or other drugs that might tend to impair his driving or lead to probable cause to believe that he is intoxicated. On the other hand, the driver who imbibes enough to raise suspicion rightfully takes his chances and should fairly be held to his waiver.

Finally, this Court should not reject the waiver exception simply because it has never before been applied to the particular circumstances in the present case. Waiver remains a "well recognized exception" to the warrant requirement, even though waiver of the specific right of an impaired driver to object to a warrantless blood draw may not be a "well recognized application" of that exception.

## D. Search Incident to Arrest.

The blood draw should also have been valid pursuant to the search-incident-to-arrest exception to the warrant preference, especially in light of the recognized exigency regarding the dissipation of alcohol from the blood.

18

*McNeely*, 133 S.Ct. at 1568 ("in every case the law must be concerned that evidence is being destroyed"); *but see Schmerber v. California*, 384 U.S. 757, 769-70, 86 S.Ct. 1826 (1966) (suggesting that search incident to arrest may not extend so far as a forced blood draw). In *Cupp v. Murphy*, the Supreme Court upheld the warrantless search of the defendant's body – obtaining samples from underneath his fingernails – as a search incident to arrest. The officers possessed probable cause to believe the defendant had strangled the victim, and the circumstances also involved a potential exigency. *See Cupp v. Murphy*, 412 U.S. 291, 294-95 (1973) (analogizing the highly evanescent characteristic of the fingernail scrapings to the exigent nature of blood alcohol described in *Schmerber*).[4]

In the search-incident-to-lawful-arrest scenario, a law enforcement officer may conduct a full but reasonable search of a person, unlike the scenario often seen where the search focuses on a vehicle. *See, e.g., Arizona v. Gant*, 556 U.S. 332, 338 (2009). There is no limit on the scope of such a search, other than the Fourth Amendment's core reasonableness requirement.[5] *See United States v. Edwards*, 415 U.S. 800, 803 n.9 (1973).

---

[4] *See Schmerber*, 384 U.S. 757.

[5] The *McNeely* majority acknowledged that, unlike the exigent circumstances exception, the traditional warrant exception known as search-incident-to-arrest applies categorically, not requiring a case-by-case analysis. *McNeely* at 1558 n.3.

Here, the nexus between the crime being investigated and the search being sought is beyond dispute. Additionally, the instant search-incident-to-arrest responds to the need to preserve evidence.

## IV. OTHER SIGNIFICANT FACTORS.

In addition to the specific exceptions into which a mandatory blood draw might fit, a number of factors should be considered in determining the overriding question – is it "reasonable" to allow this sort of warrantless blood draw?

## A. Legitimate Governmental Interest.

The Supreme Court has recently stated, concerning warrantless searches, that the "application of 'traditional standards of reasonableness' requires a court to weigh 'the promotion of legitimate governmental interests' against 'the degree to which [the search] intrudes upon an individual's privacy.'" *Maryland v. King*, 133 S.Ct. 1958, 1970 (2013) (reasonable to require buccal swab as a legitimate police booking procedure) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297 (1999)). In the present case, the legitimate interests of the State in detering drunk driving is thus a factor to weigh in favor of upholding the present mandatory draw statute.

**B. Gravity of the Offense.**

In Welsh v. Wisconsin, the Supreme Court recognized that the Fourth Amendment authorizes common-sense consideration of the gravity of the underlying offense when weighing the existence of an exigency. *Welsh v. Wisconsin*, 466 U.S. 740, 751-52 (1984). According to the Court, a crime's severity should be considered as an "important" or "principal" factor in the exigency calculation. The mandatory-blood draw statute applies this legal theory by authorizing compelled draws only in limited, serious cases involving felony conduct or less-than-minor injuries.

**C. Bright-Line Rule.**

By providing a limited number of instances mandating compelled blood draws, the implied-consent framework provides a standard "essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway v. New York*, 442 U.S. 200, 213–14 (1979) (applying the Fourth Amendment to facts unrelated to the instant scenario).

**D. Presumption of Validity and Constitutionality.**

Statutes are presumed constitutional until determined otherwise; challengers to a statute's constitutionality bear the burden of rebutting

21

presumed constitutionality. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).

In addition, the Supreme Court has recognized that "[t]he presumption of validity which applies to legislation generally is fortified by acquiescence continued through the years." *Life & Casualty Ins. Co. v. McCray*, 291 U.S. 566, 572, 54 S.Ct. 482 (1934). Implied consent statutes of the present nature have been around in Texas and other states for the past 30 years without any significant challenge to their constitutionality. The fact that these statutes are widely accepted throughout the country and have survived for so long without any such challenge should weigh heavily in favor of a presumption that the mandatory draw is valid, reasonable, and constitutional.

### E. The Underlying Expectation of Privacy.

While a state statute cannot contravene the Fourth Amendment protection and requirements for a warrant, it may both represent and inform the extent of the societal "reasonable expectation of privacy."

The Supreme Court has recognized that the extent to which society recognizes an expectation of privacy in any particular context evolves with changing conditions, and that state statutes themselves may represent and mirror those expectations. *See City of Ontario v. Quon*, 130 S.Ct. 2619, 2629-30 (2010) (city's review of employee's text messages was reasonable,

and thus did not violate Fourth Amendment). In addition, clearly communicated policies of someone in authority, such as an employer, may shape the reasonable expectation of privacy for those subject to his or her authority. *See Quon*, 130 S.Ct. at 2630. Likewise, clearly communicated policies concerning the driving privilege may shape a driver's expectation of privacy in his blood should he be stopped on suspicion of DWI.

Accordingly, to the extent that mandatory draw statutes represent a lowering of the driving public's expectations concerning privacy in their blood and what they may be required to do in certain circumstances, that lowering of expectations may inform the debate concerning the extent to which the Fourth Amendment privacy right continues to require a warrant. Stated another way, the people have spoken, through their legislators, concerning their expectations about privacy, and reasonable intrusions thereon, when they are caught driving in an impaired condition.

### F. Habitual Offenders Have a Diminished Expectation of Privacy.

In addition, not all persons are equal under the Fourth Amendment. Those with prior criminal convictions may be forced to abide by different rules. *See Samson v. California*, 547 U.S. 843, 856 (2006) (random search of parolee in California requires no suspicion); *United States v. Knights*, 534 U.S. 112, 121 (2001) (warrantless search of federal probationers

house requires only reasonable suspicion); *Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987) (warrantless search of probationer's house in Wisconsin requires less than probable cause). Texas may further restrict the privileges of those who have prior DWI convictions with the aim of combatting recidivism. *Samson*, 547 U.S. at 853 (citing *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 365 (1998)).

## G. The Specific Context of a Post-Arrest Mandatory Draw.

As a practical matter, the suspect has already been arrested and cannot complain that the blood draw is interfering with his freedom; he will sit waiting either at the hospital or at the jail. He cannot complain that he is being subjected to forced surgery or medication, or some risky or painful medical procedure. He will receive the same pin prick that all patients come to expect as a routine matter of occasional testing.[6] The testing of that blood will not put his entire medical condition before the public eye, but will be limited to testing for intoxicants to confirm or deny that he was driving while intoxicated. In short, the privacy interest being invaded is slight in the context of a post-arrest mandatory draw.

---

[6] Blood tests have been described as commonplace, routine, and safe by the Supreme Court. *See South Dakota v. Neville*, 459 U.S. 553, 563 (1983); *Breithaupt v. Abram*, 352 U.S. 432, 436 (1957).

**H. Statutory Protections Concerning the Manner of Drawing Blood.**

Concurrent with the lack of a warrant requirement, the mandatory draw statute provides added protection concerning the procedure for the blood draw, which significantly alleviates the concerns expressed by *McNeely* and *Schmerber*.

The Supreme Court in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966), focused its concern not only on the initial justification for the blood draw, but also, arguably primarily, on the means and procedures employed and whether they involve "an unjustified element of personal risk of infection and pain." 384 U.S. at 772.

Assuming that the bodily invasion itself is the primary concern, that invasion can be significantly ameliorated by a statutory framework that requires the conditions of the draw to be sanitary and restricts those persons who may draw blood to a qualified few.

The blood draw provisions in the Transportation Code require both that the person drawing the blood be qualified and that it be taken in a sanitary place, as follows:

> (a) Only the following may take a blood specimen at the request or order of a peace officer under this chapter:
> (1) a physician;
> (2) a qualified technician;
> (3) a registered professional nurse;
> (4) a licensed vocational nurse; or

25

(5) a licensed or certified emergency medical technician-intermediate or emergency medical technician-paramedic authorized to take a blood specimen under Subsection (c).

(a-1) The blood specimen must be taken in a sanitary place.

Tex. Transp. Code § 724.017.

Accordingly, blood drawn pursuant to this statutory mandate avoids the concerns present in *McNeely*, where a favorable ruling would have opened up the possible situations where blood could be drawn to any environment that the officer might consider appropriate and any person that the officer in his discretion might consider to be competent to draw it. Had McNeely gone the other way, it is easy to imagine officers on patrol carrying a little blood draw kit, with minimal training thereon, ready to take blood wherever they encounter a drunk driver. *See Schmerber v. California*, 384 U.S. 757, 772, 86 S.Ct. 1826 (1966) (questioning the reasonableness of a blood draw "administered by police in the privacy of the stationhouse"). The Texas draw statute protects drivers against this sort of arbitrary procedure and should ease their minds concerning the circumstances of a required draw. These statutorily enhanced procedures should be considered in balancing the reasonableness of the statutory mandate against the actual intrusion allowed thereunder. In other words, to the extent that the statute lessens the dangers of a painful or unsanitary draw, it should likewise lessen the hurdle that the State must overcome in order to justify such a warrantless

26

draw. *See Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) ("fact than an intrusion is negligible is of central relevance to determining reasonableness").

## I. Mistake of Law.

Finally, the State believes that the very recent opinion by the United States Supreme Court in *Heien v. North Carolina*, --- U.S. ---, No. 13-604 (December 15, 2014), should be considered by this Court.

In *Heien*, the Supreme Court, arguably for the first time, recognized that an officer's reasonable mistake of law, like a reasonable mistake of fact, may render legal conduct that would otherwise amount to a Fourth Amendment violation. Specifically, in *Heien*, the Court held that it was "objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop." Slip op. at 13.

On a broader level, the Supreme Court reasoned that, "[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them 'fair leeway for enforcing the law in the community's protection.'" Slip op. at 5 (quoting *Brinegar* v. *United States*, 338 U. S. 160, 176 (1949)).

In the present case, Trooper Anguiano clearly relied on what he reasonably believed to be a valid statutory mandate for him to require the blood draw in question. To that extent that he reasonably relied upon the implied consent / mandatory draw statute, he, like Sergeant Darisse, did not violate the Fourth Amendment by conduct that would later be shown to be a mistake of law.

## V. THE UNIQUE NATURE OF THE INTRUSION – SEARCH OR SEIZURE?

Finally, the State would suggest that the Supreme Court has mislabeled a blood draw as a "search," when it more properly fits the legal definition of a "seizure." The distinction is more than merely academic, as a seizure or arrest, unlike a search, generally does not require a warrant. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 340-41, 121 S.Ct. 1536 (2001).

The Supreme Court has distinguished searches from seizures as follows: "A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property." *Horton v. California*, 496 U.S. 128, 133, 110 S.Ct. 2301 (1990) (citing *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652 (1984)); *see also State v. Powell*, 306 S.W.3d 761, 769 n.14 (Tex. Crim. App. 2010) (citing *Horton*).

28

When *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826 (1966), was decided some fifty years ago, the Supreme Court acknowledged the unique nature of the intrusion in forced blood draws and stated, "Because we are dealing with intrusions into the human body rather than with state interferences with property relationships or private papers—'houses, papers, and effects'—we write on a clean slate." 384 U.S. at 767-68. Recently, the Supreme Court has continued to recognize forced blood draws as "an invasion of bodily integrity [that] implicates an individual's 'most personal and deep-rooted expectations of privacy.'" *Missouri v. McNeely*, 133 S.Ct. 1552, 1558 (2013). Similarly, the Supreme Court has characterized buccal swabs of the mouth as "an invasion of 'cherished personal security' that is subject to constitutional scrutiny." *Maryland v. King*, 133 S.Ct. 1958, 1969 (2013) (quoting *Cupp v. Murphy*, 412 U.S. 291, 295, 93 S.Ct. 2000 (1973)).

However, in writing on a "clean slate," the Court has, in the State's view, too hastily categorized a blood draw as a search rather than a seizure.

In the present case, the interest being protected is, like an arrest, grounded in an individual's dominion over his own person, rather than on the privacy of things carried on his person. Blood is not a briefcase, pocket, or purse in which a person may carry private things, and it is not the private nature of the blood being seized that gives rise to the Fourth Amendment

protection, but the manner of getting at that blood through an assault on the skin and veins of the person in question. Accordingly, as with an arrest, the Fourth Amendment here protects personal dominion rather than privacy.

Blood draws are comparable to the use of a taser as an incident of the defendant's arrest. *See, e.g., Carpenter v. Gage*, 686 F.3d 644, 649-50 (8th Cir. 2012); *Newman v. Guedry*, 703 F.3d 757 (5th Cir. 2012); *Cook v. City of Bella Villa*, 582 F.3d 840, 849-50 (8th Cir. 2009). Both situations involve forcing a metal object under the defendant's skin – the taser being significantly more severe – and both should be analyzed as a form or manner of seizure, rather than as a search, for purposes of the Fourth Amendment.

Although the Supreme Court has summarily categorized a forced blood draw as a search, the State would argue that it should re-examine this analysis and hold that it amounts instead to a seizure - in the nature of an extension or collateral part of the arrest of the person - and that, as such, there is no warrant requirement if probable cause has already been established.

## VI. CONCLUSION.

Although the *McNeely* opinion arguably raised some uncertainty concerning the constitutionality of mandatory draw statutes, there is every reason to believe that one or more of the exceptions discussed above will be

sufficient to sustain the constitutionality of the Texas statute, which is narrowly drawn to include only the most egregious offenders and situations.

The Thirteenth Court of Appeals erred in refusing to hold that the mandatory blood draw provisions of the Texas Transportation Code are a constitutionally valid alternative to the warrant requirement.

**II. Whether the defendant preserves his Fourth Amendment objection to blood evidence when he fails to object to testimony concerning the results of testing done on that blood and only later objects to admission of the blood sample itself.**

Smith failed to object timely on Fourth Amendment grounds to testimony concerning the results of the blood alcohol testing in question, and, when he did later object, the trial court carried Smith's constitutional objection with the case and only conditionally admitted the blood evidence itself, and Smith failed to renew this objection and secure a final ruling until after he had rested and the evidence was complete.

When State Trooper David Anguiana testified concerning his observation of the blood draw, Smith objected that there was no evidence that the person who drew the blood was a qualified technician, which the trial court purported to "sustain," but nevertheless allowed the witness to testify as to what he saw. (RR vol. 1, p. 48) Trooper Anguiana testified that he identified Anna Marie Quintanilla as a qualified technician and that she

31

drew Smith's blood. (RR vol. 1, p. 49) Trooper Anguiana then identified the blood tube in question, which was marked as SX # 2. (RR vol. 1, pp. 50-53)

DPS Forensic Scientist Emily Bonvino then testified concerning the test results for SX #2. Specifically, Bonvino testified, without objection, that the vial containing Smith's blood tested at .21 grams of alcohol per 100 milliliters of blood, and that this showed Smith was likely over the legal limit of .08 percent at the time he was driving. (RR vol. 1, pp. 78-80) Later, Smith's attorney did briefly raise a Fourth Amendment challenge based on the lack of an order from a magistrate or judge for the blood draw in question, but the trial court indicated that it would carry this objection and reserve ruling on the admissibility of the evidence. (RR vol. 1, pp. 83-85, 93-95).

Anna Marie Quintanilla testified that she was a medical technologist working for Northwest Regional, and that her duties there included collecting blood, as well as testing specimens and maintaining the instruments. (RR vol. 2, pp. 4-5) Quintanilla testified that the blood sample was taken using reliable procedures that were recognized by the scientific community, followed by the hospital, and required by State regulations. (RR vol. 2, pp. 15-16) Smith raised no objection here to Quintanilla's

32

testimony or her qualification to draw the blood in question, nor did he renew any previous objection.

At the close of the evidence on guilt-innocence and after both sides rested (RR vol. 2, pp. 19-20), Smith's attorney made a motion for directed verdict, arguing, among other things, that his blood was illegally seized without a court order and in violation of Due Process. (RR vol. 2, pp. 20-21)

In order to preserve error, a party must make a timely objection and obtain a ruling before the objectionable evidence has been admitted. See Tex. R. App. P. 33.1. By failing to object on Fourth Amendment grounds to Bonvino's testimony concerning the result of the blood alcohol test, Smith clearly waived error concerning the only evidence that really mattered in this case – testimony that Smith's blood tested over the limit. By analogy, an objection to photographic evidence is waived if the same information contained in the photograph is conveyed to the jury in some other form, such as testimony concerning the contents of the photograph in question. *See Ford v. State*, 919 S.W.2d 107, 117 (Tex. Crim. App. 1996) *see also Leday v. State,* 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (The admission of evidence over objection "will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). Here, in order to preserve error, Smith likewise should have

objected not only to the physical blood evidence, but also to Bonvino's testimony concerning the results of the blood test.

Alternatively, by failing to renew his late objection and secure a final ruling until after the close of the evidence, Smith also failed to preserve the constitutional challenge that he relies upon on appeal. When evidence is conditionally admitted, the opposing party must renew his original objection by a motion to strike the conditionally admitted evidence before the close of the evidence, and failure to do so constitutes waiver. *See Powell v. State,* 898 S.W.2d 821, 829 (Tex. Crim. App. 1994).

Accordingly, the Thirteenth Court of Appeals erred in even reaching the constitutional challenge in view of Smith's failure to preserve error.

## PRAYER FOR RELIEF

For the foregoing reasons, the State requests that the Court reverse the judgment of the Court of Appeals and remand for consideration of other issues on appeal.

Respectfully submitted,

/s/ *Douglas K. Norman*

_____
Douglas K. Norman
State Bar No. 15078900
Assistant District Attorney
105th Judicial District of Texas
901 Leopard, Room 206

Corpus Christi, Texas 78401
(361) 888-0410
(361) 888-0399 (fax)
douglas.norman@co.nueces.tx.us

## RULE 9.4 (i) CERTIFICATION

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in Rule 9.4(i)(1), is 6,807.

/s/ *Douglas K. Norman*
_____
Douglas K. Norman

## CERTIFICATE OF SERVICE

This is to certify that, pursuant to Tex. R. App. P. 6.3 (a), copies of this brief were e-mailed on February 17, 2015, to Respondent's attorney, Mr. Donald B. Edwards, and to the State Prosecuting Attorney.

/s/ *Douglas K. Norman*
_____
Douglas K. Norman